## COMMONWEALTH *versus* THOMAS AVES.

A citizen of any one of the United States where negro slavery is established by law, who comes into this State for any temporary purpose of business or pleasure, bringing a slave with him as a personal attendant, and stays some time, but does not acquire a domicil here, cannot restrain the slave of his liberty during his continuance here, and carry him out of this State against his consent.

*HABEAS corpus.* On the 17th of August, 1833, upon the petition of Levin H. Harris, of Boston, representing that a colored female child, named Med, of New Orleans, was unlawfully restrained of her liberty by Thomas Aves of Boston ; a writ of *habeas corpus* was granted by *Wilde* J., in vacation, directed to the sheriffs of the several counties and their respective deputies, commanding them to have the child before him, and to summon Aves to show the cause of her detention.

In showing cause Aves states upon his oath, that he has the child in his custody ; that in 1833, Samuel Slater, a citizen of the State of Louisiana, domiciled at and residing in the city of New Orleans, purchased the child and its mother as and for his slaves, the mother and child being then and there, and long

before that time, slaves by the laws of that State ; that from the time of the purchase until about the first day of May, 1836, the mother and child remained the slaves of Slater in New Orleans, and by force of the laws of Louisiana ; that on or about that day Mary Slater, the wife of S. Slater and the daughter of Aves, left New Orleans for the purpose of coming to Boston and visiting her father, intending to return to New Orleans and to her husband, (who remained in that city,) after an absence of four or five months for the purpose above mentioned ; that the mother of the child remained in New Orleans, in slavery, then and still being the property of S. Slater by the laws of Louisiana ; that Mary Slater brought the child with her from New Orleans to Boston, having and retaining the child in her custody as the agent and representative of her husband, her object, intent, and purpose being to have the child accompany her and remain in her custody and under her care during her temporary absence from New Orleans, and that the child should return with her to New Orleans, their legal domicil ; that the child was confided to the custody and care of Aves by *July 2d.* Mary Slater, to be by him kept and nurtured during the absence of Mary Slater from Boston for a few days on account of ill health ; that by the laws of Louisiana the marriage of a slave is void ; that this child is the daughter of a slave, born in a state of slavery, and is by force of the laws of Louisiana a natural child ; that by the same laws the mother of a natural child is its legal guardian, and that such right of guardianship over the infant children of a slave, where such children are not themselves slaves, devolves upon the owner of their mother ; that if this child is, by force of the laws of Massachusetts, now emancipated and a free person, S. Slater, as the owner of the mother of this natural child, is entitled to the custody of the person of the child as its legal guardian, and that Aves is the agent and legally authorized representative of S. Slater in this behalf ; that the child is about six years of age and wholly incapable of taking care of itself ; that it is absolutely necessary that some person should have the custody of the person of the child and the right to restrain it of its liberty ; that no private person nor magistrate has, by the laws of Massachusetts, any right to take the child out of the possession of Aves while he

continues to use that possession and custody only for .he purpose of benefiting the child, and only restraining it of its liberty so far as is necessary for its safety and health ; and that he does not now and has not at any time restrained it of its liberty in any other way, or to any greater extent, than is necessary foi its health and safety.

The case was adjourned into court, and was argued before all the judges.

*B. R. Curtis*, for the respondent. In this case I shall endeavour to maintain the following proposition ; that a citizen of a slaveholding State, who comes to Massachusetts for a temporary purpose of business or pleasure, and brings his slave as a personal attendant on his journey, may restrain the slave for the purpose of carrying him out of Massachusetts and returning him to the domicil of his owner.

In support of this proposition I shall make two points ;

1. That this child, by the laws of Louisiana, is *now* a slave. She has not been emancipated by coming into a State where slavery is not sanctioned by law, and the moment she returns to Louisiana the right of the master will be recognised as having always subsisted. *Lunsford* v. *Coquillon*, 14 Martin, 405 ; *Rankin* v. *Lydia*, 2 Marshall's (Kentucky) Rep. 477 ; *The Slave*, *Grace*, 2 Haggard's Adm. Rep. 94.

2. That the law of Massachusetts will so far recognize and give effect to the law of Louisiana, as to allow the master to exercise over his slave the qualified and limited right above specified.

Before I proceed to discuss this question, I submit that it is competent to this Court to decide it. No legislation is necessary. It is the proper province of this Court to determine whether any, and what effect, is to be given within our territory, to the law of another State. Story's Conflict of Laws, 25 ; *Blanchard* v. *Russell*, 13 Mass. R. 6 ; *Dalrymple* v. *Dalrymple*, 2 Haggard's Consist. Rep. 59.

To recur then to the second point, it cannot be denied that the general principles of international law are broad enough to cover this case. Slaves are looked upon in all codes in two lights, as *persons*, and as *property*. The general rule of international law applicable to them as persons, is, that personal

*Commonwealth v. Aves.*

*Aug. 26th*

capacity or incapacity, attached to a party by the law of his domicil, is deemed to exist everywhere, so long as his domicil remains unchanged. Story's Conflict of Laws, 64 ; *Potter* v. *Brown*, 5 East, 131. And the rules applicable to slaves as the property of foreigners are equally decisive. Pothier remarks, that movable property has no locality, and that " all things which have no locality follow the person of the owner, and are consequently governed by the law or custom which governs his person, that is to say, by the law of the place of his domicil." And this rule has a more extensive application than merely to regulate the forms of transfer or the order of succession to personal property ; it means, that a right to a movable thing, acquired in one country under its laws, ought not to be and is not divested by removing that thing into another country. Story's Conflict of Laws, 209, 312, 313, 334, 335, 336.

There are two well-settled exceptions to the operation of a foreign law ; 1. when it would work injury to the State or its citizens ; 2. when the law is in itself immoral. Story's Conflict of Laws, 96 ; 2 Kent's Comm. (3d edit.) 457, 458 ; *Greenwood* v. *Curtis*, 6 Mass. R. 378. But neither of these exceptions is applicable to the present case.

Before speaking to these points, I will anticipate an objection which is supported by high authority. In the case of *Sommersett*, 20 Howell's State Tr. 79, Lord *Mansfield*, speaking of slavery, remarks, " The difficulty of adopting the relation, without adopting it in all its consequences, is indeed extreme ; and yet, many of those consequences are absolutely contrary to the municipal law of England. We have no authority to regulate the conditions in which law shall operate." It will be urged, that though we claim to exercise only a qualified and limited right over the slave, namely, the right to remove him from the State, yet if this is allowed, all the rights of the master must be allowed ; that the same foreign law which gives the master a right to remove the slave from place to place, gives him a right to his labor, and to compel him to labor ; and that if the foreign law is recognised at all, full effect must be given to it, and thus slavery will be introduced into the Commonwealth. To this we answer, that there is no *practical*

difficulty in giving this qualified effect to the law of Louisiana, or in the case of a *fugitive* slave the constitution of the United States provides for and secures to the master the exercise of his right, to the precise extent now claimed. And if there be any *theoretical* difficulty, as suggested by Lord *Mansfield*, it has not been found insurmountable by the English judges since his day. Where ships of other nations engaged in the slave trade have been captured by British cruisers, if the slave trade was allowed by the laws of the nation to which the vessel belonged, the vessel and slaves have been restored to the owners. *The Amedie*, 1 Acton, 240 ; *The Fortuna*, 1 Dodson, 81 ; *The Diana*, 1 Dodson, 95 ; *Le Louis*, 2 Dodson, 238 ; *Madrazo* v. *Willes*, 3 Barn. & Ald. 358 ; *Emerson* v. *Howland*, 1 Mason, 45. It might as well be objected, that this Commonwealth, by permitting a foreign country to reclaim a fugitive from justice, would recognize the right of such country to try, condemn and punish him on our soil. *Rex* v. *Ball*, 1 American Jurist, 297 ; Story's Conflict of Laws, 24.

I will now attempt to show, that to permit such an exercise of the right of the master as is now claimed, will work no injury to this State or its citizens.

1. It will work no injury by violating any public law of the State. The only statute relating to this subject (Revised Stat. c. 125, § 20,) provides, that no person shall "*without lawful authority*," forcibly or secretly confine or imprison any other person within this State, or forcibly carry or send any such person out of this State, &c. But in this case the master has " lawful authority."

2. It will work no direct injury to the citizens of this State, for it has no direct effect on its citizens. It respects only strangers.

3. It is not inconsistent with the public policy of this State. It is to be borne in mind, that we are considering the policy of Massachusetts towards citizens of other States, and not towards her own citizens. Laws and institutions may exist in other States, which we cannot allow to be imported into this State, but at the same time it may be perfectly consistent with our policy, not only to recognize their propriety and validity in the states where they exist, but even to interfere actively to

Common-
wealth
v.
Aves

enable the citizens of those states to enjoy those institutions at home.    It is also important to keep in view the relations which we sustain to Louisiana.    She is not a foreign nation.    We are bound up with her and the other slave-holding states, by the constitution, into a union, upon the preservation of which no one doubts that our own peace and welfare depend.    The constitution of the United States furnishes a guide in the question.    As it provides for the exercise of the right of the master over fugitive slaves, it gives us some reason to believe that it is consistent with the public policy of Massachusetts to protect his right to that extent, at least.    It will be urged that the express provision for the exercise of this right in one class of cases, is an argument to prove that the exercise of it in any other case would be contrary to our policy.    To this it may be answered, that the constitution provides for that class of cases which was most important ; a class which requires the active interposition of the law.    The slave-holding States might be willing to leave other cases to the comity of the non-slaveholding States ; and non-slaveholding States might be willing to accord as a favor and as a matter of comity, more than they were willing to surrender as a matter of right.    Accordingly, soon after the adoption of the federal constitution, the legislature of New York, Rhode Island, Pennsylvania and New Jersey, passed laws securing to citizens of slave States, who came within their territories as travellers and brought slaves with them, a right to take those slaves back to their domicil.    1 Revised Laws of New York, 657 ; Laws of Rhode Island, (edit. of 1798,) 607 ; Purdon's Dig. of Laws of Penn., 650 ; Laws of New Jersey, 679.

Slavery is not immoral ; and to allow the master to exercise the right in question will not exhibit to our citizens "an example pernicious and detestable."    It is true, it is not consistent with natural right ; but the standard of morality by which courts of justice are to be guided, is that which *the law* prescribes. *Le Louis,* 2 Dodson, 249 ; *The Antelope,* 10 Wheaton, 121 ; *Madrazo* v. *Willes,* 3 Barn. & Ald. 353 ; *Emerson* v. *Howland,* 1 Mason, 45 ; *Commonwealth* v. *Griffith,* 2 Pick. 19.

Of the authorities which bear more directly on the question before the Court, the leading case is that of *Somersett,* 20

Howell's State Trials, 1. We admit that this case settled the law of England. It is to be regretted, however, that the grounds on which the court proceeded are not more fully reported. We are able to discover but three principles in the opinion. One is, the difficulty above mentioned, of adopting the relation of slavery, without adopting it in all its consequences. Secondly, it is said, " Contract for sale of a slave is good here ; the sale is a matter to which the law properly and readily attaches, and will maintain the price according to the agreement. But here the person of the slave himself is immediately the object of inquiry ; which makes a very material difference." 20 Howell's State Tr. 79. I am unable to perceive the distinction. The subject of such a contract is the person of the slave, and in an action on such contract the subject of inquiry is, whether the vendor sold to the purchaser the person of the slave. And in 3 Barn. & Ald. 353, in the action brought against the captain of a British cruiser, the subject of inquiry was, whether the plaintiff owned the persons of the slaves, and the defendant destroyed his property. How then can it be said that the person of the slave comes in question in the one case more than in the other ? The third principle is, that " the state of slavery is of such a nature, that it is incapable of being introduced on any reasons moral or political, but only by positive law." " Slavery is so odious, that nothing can be suffered to support it but positive law." Now, if by positive law is meant a law enacted by the legislative power of the country, this assertion is not true in point of fact ; for in all modern states, with the exception of some of the colonies of Spain, slavery has been introduced by custom, and without any action of the legislative power. If by positive law, it is meant that there must be some law of the State, which at least permits the master to exercise acts of ownership over the slave, this is undoubtedly true ; and such a law we expect to find in Massachusetts, in the principle which declares that the law of the domicil shall govern, as to the relations between foreigners, except in so far as it contradicts our own policy and laws. If by positive law is meant a law of the State where the question arises, without reference to the law of the domicil, and that the law of the domicil cannot be in any degree

regarded, even where the question arises between strangers the position is not law, even in England, as is proved by the cases in which the English courts have recognized the foreigner's right of property in slaves.

But the grounds on which we distinguish this case from that of Sommersett are, that the owner of Sommersett was a British subject, resident in Virginia, then a British colony ; that the question of national comity did not arise in that case ; that none of the considerations which grow out of our close and peculiar relations with the State of Louisiana, there existed ; that the public policy of England, in respect to her dependent colonies, was a very different thing from the public policy of Massachusetts, in respect to her sister States ; that a citizen of Louisiana has a different standing in our courts, at this day, from the standing of a Virginian in the King's Bench in 1772, just before the breaking out of the revolutionary war ; in short, that Sommersett's case was decided by an English court, on considerations proper to that country, and that this case is to be decided by a Massachusetts court, upon reasons proper to ourselves. Suppose that slavery had existed in Scotland before the union ; that it had become incorporated into all her institutions, civil, political and domestic ; that it was not only of great importance to the Scottish nation, but a matter in which they felt an intense interest, transcending even its real importance ; that the existence of this institution was one of the chief obstacles to a union of the two kingdoms ; that its protection was provided for and guarantied, and the faith of the English nation pledged thereto, by the act of union ; that it was made the basis of taxation and representation, in the imperial parliament ; and then suppose that a Scottish gentleman had been travelling in England with his slave, and restraining him for the purpose of carrying him back to Scotland, and that this slave had been brought before Lord *Mansfield* on a writ of *habeas corpus ;* would the slave have been dismissed from the custody of his master, on the ground that slavery was so odious, that the master should not be permitted to carry his slave home, because there was no positive law of parliament providing for the case ? Should we not have heard something of the act of union ; of the intimate relations between the two

kingdoms ; of the great importance of the institution to the sister kingdom ; of the state of feeling there on the subject ; of the necessity of preserving amicable feelings and encouraging intercourse between the people of the different sides of the border ? We submit that the result would have been different from the result of Sommersett's case.

In support of our view of the case before the Court, we cite *The Antelope*, 10 Wheaton, 66 ; 3 American Jurist, 407 ; *Rankin* v. *Lydia*, 2 Marshall, (Kentucky,) 477.

*Ellis G. Loring*, for the Commonwealth. It has been urged by the counsel for the respondent, that the citizens of the slave States, visiting Massachusetts, are to be permitted to bring their slaves with them, and to take them away on their return ; that this permission is required of us by the comity of nations ; and that this obligation arises from the general doctrines of international law, and also from the peculiar relation existing between the members of the Union.

Comity is not to be exercised in doubtful cases ; and whenever a " doubt does exist, the court which decides, will prefer the law of its own country, to that of the stranger." *Saul* v. *His Creditors*, 17 Martin, 596 ; Story's Confl. of Laws, 29, 271.

Comity is practically founded on the consent of nations, and the need which is felt of reciprocal good offices. Now nothing is more certain than that no such consent of nations prevails on this subject, in any part of Europe. 20 Howell's State Tr. 61 ; 2 Kent's Comm. (1st edit.) 203. Nor is there room here for reciprocity. We have no slaves in Massachusetts, in regard to whom we can ask the same comity which is claimed of us. Nay, the comity which is due to *freemen*, is not extended to us by the slave-holding States. In all those States, color furnishes a presumption of slavery, and a free colored citizen may be called on to prove affirmatively his freedom, or be sold into slavery. In direct violation of the constitutional provision guarantying to the citizens of each State " all privileges and immunities of citizens in the several States," colored citizens of the North, seamen or others, are forbidden by law from entering many of the southern ports of this Union, on peril of being confined in jail till the departure

of the vessel in which they arrived, the captain to pay the jail expenses, under the penalty of 1000 dollars fine and not less than six months imprisonment. Laws of South Carolina, 1823, c. 20 ; Laws of Georgia, 1829, c. 68 ; 1 Martin's Dig. of Laws of Louisiana, 678.

There is no room for comity, where the subject has been made matter of express regulation. The constitution of the United States secures to the master the right to reclaim his slave who *escapes* from the State where he is held to service, and it is not to be supposed that the southern framers of the constitution would leave a doubtful point, like the present, to be settled by comity, while they guarded with jealous care an apparently far stronger right. 3 Story on the Constitution, 676. Still less is the doctrine of comity admissible, where, as in the adoption of the federal constitution, the express regulations are the result of mutual concessions, after long dispute and difficulty. *Commonwealth v. Griffith*, 2 Pick. 19.

The law of the foreign domicil will be found to be applied chiefly to cases of mere contract. In respect to the domestic relations, comity cannot be allowed so wide a range.

It is laid down as a necessary exception to the rule of comity, that no people are bound to enforce or hold valid in their courts of justice, any contract or law, which offends their morals, or contravenes their policy, or violates a public law, or offers a pernicious example. 2 Kent's Comm. (3d edit.) 457 ; Story's Confl. 95 ; *Greenwood v. Curtis*, 6 Mass. R. 358.

Slavery is within all these exceptions.

It is offensive to morals. The testimony of ethical writers against slavery is unanimous and decisive. And some of the most eminent statesmen of the South, as Patrick Henry, Thomas Jefferson, William Pinckney, have concurred with the moralist and civilian on this subject. *Forbes v. Cochrane*, 3 Dowl. & Ryl. 679 ; *S. C.* 2 Barn. & Cressw. 448 ; Wayland's Elem. of Moral Science, 209 ; Rutherforth's Inst. Nat. Law, *bk.* 1, *c.* 20 ; *Sommersett's case*, 20 Howell's St. Tr. 32, note ; Stroud's Sketch of the Laws relating to Slavery in the U. S. 25 ; Civil Code of Louisiana, *art.* 35 ; Mass. Declaration of Rights, *art.* 1 ; *Winchendon v. Hatfield*, 4 Mass. R. 128 ; *Greenwood v. Curtis*, 6 Mass. R. 366, note . Story's Confl 215. note.

Slavery contravenes our policy. Massachusetts has known nothing like the slave system of Louisiana. The slavery which was abolished here nearly sixty years since, resembled little more than in name the hard bondage of the South. It was milder than the ancient English villenage, and differed from apprenticeship only in its duration. Ancient Charters, &c. 52 ; *Winchendon* v. *Hatfield*, 4 Mass. R. 127 ; Reeve's Dom. Rel. 340 ; 2 Dane's Abr. 313 ; 20 Howell's State Tr. 66.

Slavery violates our public law. The law of this Commonwealth, on slavery, from the adoption of the constitution of Massachusetts to the ratification of the federal constitution, was to all intents and purposes the same with the law of England as settled in *Sommersett's case*, in 1772. *Winchendon* v. *Hatfield*, 4 Mass. R. 127.

Slavery sets before our citizens a pernicious and detestable example. Whatever is in itself bad and capable of imitation, must be, if tolerated among us, of bad example. It is not a satisfactory answer, that the constitution prohibits the holding of slaves in this State ; the constitution is only the expression of public sentiment, and may be altered if that sentiment shall change.

But it has been argued, that as the constitution of the United States recognizes slavery, we are estopped to deny its morality or policy. It is true, we have agreed to recognize slaves as a basis for direct taxation and representation, and to give them up when they abscond into the free States. So far we are estopped, but no further. Amendments to Constitution of U. S. *art.* 10. It has been decided in some of the States, that the provision respecting slaves *escaping* from one State into another, does not extend to the case of a slave *voluntarily* carried by his master into another State ; and the statutory provisions of New York and some other States, cited by the counsel for the respondent, were enacted on the ground that the special exemption was necessary, to prevent the local law of freedom from entirely annulling the law of the foreign domicil. *Butler* v. *Hopper*, 1 Wash. C. C. R. 499 ; *Ex parte Simmons*, 4 Wash. C. C R. 396 ; Stroud's Sketch, &c. 167 ; *Lunsford* v. *Coquillon*, 14 Martin, 401. So slavery

Common-
wealth
v.
Aves.

was tolerated by law in the British colonies, but this did not prevent the Court of King's Bench from deciding on its immorality and impolicy in England. 20 Howell's State Tr. 82. The law of all Europe is, that slavery is a local institution ; that slaves in the colonies are *property*, but that in the parent country they are *men*. On this account, Lord *Mansfield* says, (20 Howell's State Tr. 79,) there is no difficulty in giving effect in England, to a contract made in a foreign country for the sale of a slave ; but where the person of the slave is in England and becomes the subject in controversy, that is a widely different case. If this distinction is kept in view, coupled with the principle that no civilized nation will sanction an aggression upon the legal rights of the subjects of other friendly nations within their own limits, there will be no great difficulty in reconciling the admiralty and other cases cited on the other side, with the point for which we contend. *Forbes* v. *Cochrane*, 3 Dowl. & Ryl. 679, and 2 Barn. & Cressw. 448 ; *Knight* v. *Wedderburn*, 20 Howell's State Tr. 3, note. We have adopted in this country a policy analogous to that of England, by recognizing slavery as a local or partially acknowledged institution. Our law is, that slaves are *property* (except as to representation) while they remain under the local law of slavery, or when they appear elsewhere in the character of fugitives. They are, on the other hand, *men*, where representation in Congress is concerned, or whenever they come rightfully within the limits of the local law of freedom. *Ex parte Simmons*, 4 Wash. C. C. R. 396 ; *Commonwealth* v. *Holloway*, 2 Serg. & Rawle, 305 ; *Saul* v. *His Creditors*, 17 Martin, 598 ; *Francisco's case,* 9 American Jurist, 490 , Story's Confl. 92·

The comity asked in the present case is not for a mere *transitus,* but is to be extended to a temporary residence. How long shall that temporary residence continue ? Why may not citizens of the slave States remain here with their slaves ten years as well as ten months, if the *animus revertendi* is preserved ?

The force of Lord *Mansfield's* remark, that " the difficulty of adopting the relation, without adopting it in all its consequences, is indeed extreme," remains unimpaired by the

argument for the respondent. The counsel has limited the master's claim to the utmost, yet let us see what it still includes. It must include the right absolutely to direct the slave's locomotion ; to confine his person ; to exact his labor without wages ; and to force him out of Massachusetts by any degree of personal violence which may be requisite. If the slave should marry here, he must of course be separated from his wife. Can he make a contract ? Will his marriage be valid, or will it be void and his children illegitimate ? Are the children born here of a slave mother, to be also slaves ? Or will their father, if he should be a free citizen of Massachusetts, be entitled to his own children ? If the slave sees a crime committed by his master, shall he be admitted as a witness ? And if he shall testify against his master, what treatment may he expect upon his return to the slave State ? If a slave is slandered in Massachusetts, has he a remedy ? If he is assaulted by a stranger, has he an action as a *person*, or does the action belong to his master as for an injury to *property* ? May the master be bound to keep the peace towards his slave ? If the slave refuse to leave the State, may the master justify an assault and battery upon him ? Suppose he kills his master in self-defence, is his act murder ?

*Choate*, on the same side. It is argued on the part of the respondent, that no principle concerning the comity of nations was settled in Sommersett's case, because Virginia was not then independent of Great Britain. But this is not so. The comity of nations, as understood in the books of law, means a respect paid to a *lex loci*, whether of an independent state or a state not independent. It does not suppose a conflict of independent nations, but a conflict of codes. Thus the respect paid in England to the local law of Scotland, is paid by the comity of nations. The decision in Sommersett's case took place before the American revolution, and so soon as the principle there settled became applicable to our circumstances, that is, so soon as we abolished slavery, it had instantly the force of authority. At any rate, there is satisfactory historical evidence that it was adopted here, even before the adoption of our constitution.

*C. P. Curtis* replied.

SHAW C. J. delivered the opinion of the Court. The question now before the Court arises upon a return to a *habeas corpus*, originally issued in vacation by Mr. Justice *Wilde*, for the purpose of bringing up the person of a colored child named Med, and instituting a legal inquiry into the fact of her detention, and the causes for which she was detained. By the provisions of the revised code, the practice upon *habeas corpus* is somewhat altered. In case the party complaining, or in behalf of whom complaint is made, on the ground of unlawful imprisonment, is not in the custody of an officer, as of a sheriff or deputy, or corresponding officer of the United States, the writ is directed to the sheriff, requiring him or his deputy to take the body of the person thus complaining, or in behalf of whom complaint is thus made, and have him before the court or magistrate issuing the writ, and to summon the party alleged to have or claim the custody of such person, to appear at the same time, and show the cause of the detention. The person thus summoned is to make a statement under oath, setting forth all the facts fully and particularly ; and in case he claims the custody of such party, the grounds of such claim must be fully set forth. This statement is in the nature of a return to the writ, as made under the former practice, and will usually present the material facts upon which the questions arise. Such return, however, is not conclusive of the facts stated in it, but the court is to proceed and inquire into all the alleged causes of detention, and decide upon them in a summary manner. But the court may, if occasion require it, adjourn the examination, and in the mean time bail the party, or commit him to a general or special custody, as the age, health, sex, and other circumstances of the case may require. It is further provided, that when the writ is issued by one judge of the court in vacation, and in the mean time, before a final decision, the court shall meet in the same county, the proceedings may be adjourned into the court, and there be conducted to a final issue, in the same manner as if they had been originally commenced by a writ issued from the court. I have stated these provisions the more minutely, because there have been as yet but few proceedings under the Revised Statutes, and the practice is yet to be established.

Upon the return of this writ before Mr. Justice *Wilde*, a statement was made by Aves, the respondent ; the case was then postponed. It has since been fully and very ably argued before all the judges, and is now transferred to and entered in court, and stands here for judgment, in the same manner as if the writ had been originally returnable in court. Notice having been given to Mr. and Mrs. Slater, an appearance has been entered for them, and in this state of the case and of the parties, the cause has been heard. The statement on oath is now to be considered in the same aspect as if made by Mr. Slater. It is made in fact by Aves, claiming the custody of the slave in right of Slater, and that claim is sanctioned by Slater, who appears by his attorney to maintain and enforce it. He claims to have the child as master, and carry her back to New Orleans, and whether the claim has been made in terms or not, to hold and return her as a slave, that intent is manifest, and the argument has very properly placed the claim upon that ground.

The case presents an extremely interesting question, not so much on account of any doubt or difficulty attending it, as on account of its important consequences to those who may be affected by it, either as masters or slaves.

The precise question presented by the claim of the respondent is, whether a citizen of any one of the United States, where negro slavery is established by law, coming into this State, for any temporary purpose of business or pleasure, staying some time, but not acquiring a domicil here, who brings a slave with him as a personal attendant, may restrain such slave of his liberty during his continuance here, and convey him out of this State on his return, against his consent. It is not contended that a master can exercise here any other of the rights of a slave owner, than such as may be necessary to retain the custody of the slave during his residence, and to remove him on his return.

Until this discussion, I had supposed that there had been adjudged cases on this subject in this Commonwealth ; and it is believed to have been a prevalent opinion among lawyers, that if a slave is brought voluntarily and unnecessarily within the limits of this State, he becomes free, if he chooses to avail himself of the provisions of our laws ; not so much because his

coming within our territorial limits, breathing our air, or tread-
ing on our soil, works any alteration in his *status*, or condition,
as settled by the law of his domicil, as because by the opera-
tion of our laws, there is no authority on the part of the master,
either to restrain the slave of his liberty, whilst here, or forcibly
to take him into custody in order to his removal. There seems,
however, to be no decided case on the subject reported.

It is now to be considered as an established rule, that by the
constitution and laws of this Commonwealth, before the adop-
tion of the constitution of the United States, in 1789, slavery
was abolished; as being contrary to the principles of justice,
and of nature, and repugnant to the provisions of the declara-
tion of rights, which is a component part of the constitution of
the State.

It is not easy, without more time for historical research than
I now have, to show the course of slavery in Massachusetts.
By a very early colonial ordinance, (1641,) it was ordered,
that there should be no bond slavery, villenage, or captivity
amongst us, with the exception of lawful captives taken in just
wars, or those judicially sentenced to servitude, as a punish-
ment for crime. And by an act a few years after, (1646,)
manifestly alluding to some transaction then recent, the general
court conceiving themselves bound to bear witness against the
heinous and crying sin of manstealing, &c., ordered that certain
negroes be sent back to their native country (Guinea) at the
charge of the country, with a letter from the governor expres-
sive of the indignation of the court thereabouts. See Ancient
Charters, &c., 52, *c.* 12, § 2, 3.

But notwithstanding these strong expressions in the acts of
the colonial government, slavery to a certain extent seems to
have crept in ; not probably by force of any law, for none such
is found or known to exist ; but rather, it may be presumed,
from that universal custom, prevailing through the European
colonies, in the West Indies, and on the continent of America,
and which was fostered and encouraged by the commercial
policy of the parent states. That it was so established, is
shown by this, that by several provincial acts, passed at various
times, in the early part of the last century, slavery was recog-
nized as existing in fact, and various regulations were prescribed

in reference to it. The act passed in June, 1703, Anc. Char-ters, &c., 746, imposed certain restrictions upon manumission, and subjected the master to the relief and support of the slaves, notwithstanding such manumission, if the regulations were not complied with. The act of October, 1705, Anc. Charters, &c., 748, 749, levied a duty and imposed various restrictions upon the importation of negroes, and allowed a drawback upon any negro thus imported and for whom the duty had been paid, if exported within the space of twelve months and *bonâ fide* sold in any other plantation.

How, or by what act particularly, slavery was abolished in Massachusetts, whether by the adoption of the opinion in Sommersett's case, as a declaration and modification of the common law, or by the Declaration of Independence, or by the constitution of 1780, it is not now very easy to determine, and it is rather a matter of curiosity than of utility ; it being agreed on all hands, that if not abolished before, it was so by the declaration of rights. In the case of *Winchendon* v. *Hatfield*, 4 Mass. R. 123, which was a case between two towns respecting the support of a pauper, Chief Justice *Parsons*, in giving the opinion of the Court, states, that in the first action which came before the Court after the establishment of the constitution, the judges declared, that by virtue of the declaration of rights, slavery in this State was no more. And he mentions another case, *Littleton* v. *Tuttle*, 4 Mass. R. 128, note, in which it was stated as the unanimous opinion of the Court, that a negro born within the State, before the constitution, was born free, though born of a female slave. The chief justice, however, states, that the general practice and common usage have been opposed to this opinion.

It has recently been stated as a fact, that there were judicial decisions in this State prior to the adoption of the present constitution, holding that negroes born here of slave parents were free. A fact is stated in the above opinion of Chief Justice *Parsons*, which may account for this suggestion. He states that several negroes, born in this country, of imported slaves, had demanded their freedom of their masters by suits at law, and obtained it by a judgment of court. The defence of the master, he says, was faintly made, for such was the temper of

the times, that a restless, discontented slave was worth little, and when his freedom was obtained in a course of legal proceedings, his master was not holden for his support, if he became poor. It is very probable, therefore, that this surmise is correct, and that records of judgments to this effect may be found ; but they would throw very little light on the subject.

Without pursuing this inquiry farther, it is sufficient for the purposes of the case before us, that by the constitution adopted in 1780, slavery was abolished in Massachusetts, upon the ground that it is contrary to natural right and the plain principles of justice. The terms of the first article of the declaration of rights are plain and explicit. " All men are born free and equal, and have certain natural, essential, and unalienable rights, which are, the right of enjoying and defending their lives and liberties, that of acquiring, possessing, and protecting property." It would be difficult to select words more precisely adapted to the abolition of negro slavery. According to the laws prevailing in all the States, where slavery is upheld, the child of a slave is not deemed to be born free, a slave has no right to enjoy and defend his own liberty, or to acquire, possess, or protect property. That the description was broad enough in its terms to embrace negroes, and that it was intended by the framers of the constitution to embrace them, is proved by the earliest contemporaneous construction, by an unbroken series of judicial decisions, and by a uniform practice from the adoption of the constitution to the present time. The whole tenor of our policy, of our legislation and jurisprudence, from that time to the present, has been consistent with this construction, and with no other.

Such being the general rule of law, it becomes necessary to inquire how far it is modified or controlled in its operation ; either,

1. By the law of other nations and states, as admitted by the comity of nations to have a limited operation within a particular state ; or

2. By the constitution and laws of the United States.

In considering the first, we may assume that the law of this State is analogous to the law of England, in this respect ; that while slavery is considered as unlawful and inadmissible in both,

and this because contrary to natural right and to laws designed for the security of personal liberty, yet in both, the existence of slavery in other countries is recognized, and the claims of foreigners, growing out of that condition, are, to a certain extent, respected.   Almost the only reason assigned by Lord *Mansfield* in Sommersett's case was, that slavery is of such a nature, that it is incapable of being introduced on any reasons moral or political, but only by positive law ; and, it is so odious, that nothing can be suffered to support it but positive law.

The same doctrine is clearly stated in the full and able opinion of *Marshall* C. J., in the case of the *Antelope*, 10 Wheat. 120.   He is speaking of the slave trade, but the remark itself shows that it applies to the state of slavery.   " That it is contrary to the law of nature will scarcely be denied.   That every man has a natural right to the fruits of his own labor, is generally admitted, and that no other person can rightfully deprive him of those fruits, and appropriate them against his will, seems to be the necessary result of the admission."

But although slavery and the slave trade are deemed contrary to natural right, yet it is settled by the judicial decisions of this country and of England, that it is not contrary to the law of nations.   The authorities are cited in the case of the *Antelope*, and that case is itself an authority directly in point. The consequence is, that each independent community, in its intercourse with every other, is bound to act on the principle, that such other country has a full and perfect authority to make such laws for the government of its own subjects, as its own judgment shall dictate and its own conscience approve, provided the same are consistent with the law of nations ; and no independent community has any right to interfere with the acts or conduct of another state, within the territories of such state, or on the high seas, which each has an equal right to use and occupy ; and that each sovereign state, governed by its own laws, although competent and well authorized to make such laws as it may think most expedient to the extent of its own territorial limits, and for the government of its own subjects, yet beyond those limits, and over those who are not her own subjects, has no authority to enforce her own laws,

or to treat the laws of other states as void, although contrary to its own views of morality.

This view seems consistent with most of the leading cases on the subject.

*Sommersett's case*, 20 Howell's State Trials, 1, as already cited, decides that slavery, being odious and against natural right, cannot exist, except by force of positive law. But it clearly admits, that it may exist by force of positive law. And it may be remarked, that by positive law, in this connection, may be as well understood customary law as the enactment of a statute ; and the word is used to designate rules established by tacit acquiescence or by the legislative act of any state, and which derive their force and authority from such acquiescence or enactment, and not because they are the dictates of natural justice, and as such of universal obligation.

*Le Louis*, 2 Dodson, 236. This was an elaborate opinion of Sir *William Scott*. It was the case of a French vessel seized by an English vessel in time of peace, whilst engaged in the slave trade. It proceeded upon the ground, that a right of visitation, by the vessels of one nation, of the vessels of another, could only be exercised in time of war, or against pirates, and that the slave trade was not piracy by the laws of nations, except against those by whose government it has been so declared by law or by treaty. And the vessel was delivered up.

*The Amedie*, 1 Acton, 240. The judgment of Sir *William Grant* in this case, upon the point on which the case was decided, that of the burden of proof, has been doubted. But upon the point now under discussion, he says, " but we do now lay down as a principle, that this is a trade which cannot, abstractedly speaking, be said to have a legitimate existence. I say, abstractedly speaking, because we cannot legislate for other countries ; nor has this country a right to control any foreign legislature, that may give permission to its subjects to prosecute this trade." He however considered, in conse-quence of the principles declared by the British government, that he was bound to hold, *primâ facie*, that the traffic was unlawful, and threw on the claimant the burden of proof, that the traffic was permitted by the law of his own country.

*The Diana*, 1 Dodson, 95. This case strongly corrobor-
ates the general principle, that though the slave trade is con-
trary to the principles of justice and humanity, it cannot with
truth be said, that it is contrary to the laws of all civilized na-
tions ; and that courts will respect the property of persons
engaged in it under the sanction of the laws of their own
country

Two cases are cited from the decisions of courts of com-
mon law, which throw much light upon the subject.

*Madrazo v. Willes*, 3 Barn. & Ald. 353. It was an ac-
tion brought by a Spaniard against a British subject, who had
unlawfully, and without justifiable cause, captured a ship with
three hundred slaves on board. The only question was the
amount of damages. *Abbott* C. J., who tried the cause, in
reference to the very strong language of the acts of Parlia-
ment, declaring the traffic in slaves a violation of right and
contrary to the first principles of justice and humanity, doubt-
ed whether the owner could recover damages, in an English
court of justice, for the value of the slaves as property, and
directed the ships and the slaves to be separately valued. On
further consideration, he and the whole court were of opinion,
that the plaintiff was entitled to recover for the value of the slaves.
That opinion went upon the ground, that the traffic in slaves,
however wrong in itself, if prosecuted by a Spaniard between
Spain and the coast of Africa, and if permitted by the laws
of Spain, and not restrained by treaty, could not be lawfully
interrupted by a British subject, on the high seas, the common
highway of nations. And Mr. Justice *Bayley*, in his opinion,
after stating the general rule, that a foreigner is entitled, in a
British court of justice, to compensation for a wrongful act,
added, that although the language used by the statutes was
very strong, yet it could only apply to British subjects. It is
true, he further says, that if this were a trade contrary to the
laws of nations, a foreigner could not maintain this action.
And *Best* J. spoke strongly to the same effect, adding, that
the statutes "speak in just terms of indignation of the horrible
traffic in human beings, but they speak only in the name of
the British nation. If a ship be acting contrary to the general
law of nations, she is thereby subject to confiscation ; but it is

impossible to say, that the slave trade is contrary to what may be called the common law of nations."

*Forbes* v. *Cochrane*, 2 Barn. & Cressw. 448 ; *S. C.* 3 Dowl. & Ryl. 679. This case has been supposed to conflict with the one last cited ; but I apprehend, in considering the principles upon which they were decided, they will be found to be perfectly reconcilable. The plaintiff, a British subject, domiciled in East Florida, where slavery was established by law, was the owner of a plantation, and of certain slaves, who escaped thence and got on board a British ship of war on the high seas. It was held, that he could not maintain an action against the master of the ship for harbouring the slaves after notice and demand of them. Some of the opinions given in this case are extremely instructive and applicable to the present. *Holroyd* J., in giving his opinion, said, that the plaintiff could not found his claim to the slaves upon any general right, because by the English laws such a right cannot be considered as warranted by the general law of nature, that if the plaintiff could claim at all, it must be in virtue of some right which he had acquired by the law of the country where he was domiciled, that where such rights are recognized by law, they must be considered as founded, not upon the law of nature, but upon the particular law of that country, and must be co-extensive with the territories of that state ; that if such right were violated by a British subject, within such territory, the party grieved would be entitled to a remedy, but that the law of slavery is a law *in invitum*, and when a party gets out of the territory where it prevails, and under the protection of another power, without any wrongful act done by the party giving that protection, the right of the master, which is founded on the municipal law of the place only, does not continue. So in speaking of the effect of bringing a slave into England, he says, he ceases to be a slave in England, only because there is no law which sanctions his detention in slavery. *Best* J. declared his opinion to the same effect. " Slavery is a local law, and therefore if a man wishes to preserve his slaves, let him attach them to him by affection, or make fast the bars of their prison, or rivet well their chains, for the instant they get beyond the limits where slavery is recognized by the local

law, they have broken their chains, they have escaped from their prison, and are free."

That slavery is a relation founded in force, not in right, existing, where it does exist, by force of positive law, and not recognized as founded in natural right, is intimated by the definition of slavery in the civil law; " *Servitus est constitutio juris gentium, qua quis dominio alieno contra naturam subjicitur*."

Upon a general review of the authorities, and upon an application of the well established principles upon this subject, we think they fully maintain the point stated, that though slavery is contrary to natural right, to the principles of justice, humanity and sound policy, as we adopt them and found our own laws upon them, yet not being contrary to the laws of nations, if any other state or community see fit to establish and continue slavery by law, so far as the legislative power of that country extends, we are bound to take notice of the existence of those laws, and we are not at liberty to declare and hold an act done within those limits, unlawful and void, upon our views of morality and policy, which the sovereign and legislative power of the place has pronounced to be lawful. If, therefore, an unwarranted interference and wrong is done by our citizens to a foreigner, acting under the sanction of such laws, and within their proper limits, that is, within the local limits of the power by whom they are thus established, or on the high seas, which each and every nation has a right in common with all others to occupy, our laws would no doubt afford a remedy against the wrong done. So, in pursuance of a well known maxim, that in the construction of contracts, the *lex loci contractus* shall govern, if a person, having in other respects a right to sue in our courts, shall bring an action against another, liable in other respects to be sued in our courts, upon a contract made upon the subject of slavery in a state where slavery is allowed by law, the law here would give it effect. As if a note of hand made in New Orleans were sued on here, and the defence should be, that it was on a bad consideration, or without consideration, because given for the price of a slave sold, it may well be admitted, that such a

defence could not prevail, because the contract was a legal one by the law of the place where it was made.

This view of the law applicable to slavery, marks strongly the distinction between the relation of master and slave, as established by the local law of particular states, and in virtue of that sovereign power and independent authority which each independent state concedes to every other, and those natural and social relations, which are everywhere and by all people recognized, and which, though they may be modified and regulated by municipal law, are not founded upon it, such as the relation of parent and child, and husband and wife. Such also is the principle upon which the general right of property is founded, being in some form universally recognized as a natural right, independently of municipal law.

This affords an answer to the argument drawn from the maxim, that the right of personal property follows the person, and therefore, where by the law of a place a person there domiciled acquires personal property, by the comity of nations the same must be deemed his property everywhere. It is obvious, that if this were true, in the extent in which the argument employs it, if slavery exists anywhere, and if by the laws of any place a property can be acquired in slaves, the law of slavery must extend to every place where such slaves may be carried. The maxim, therefore, and the argument can apply only to those commodities which are everywhere, and by all nations, treated and deemed subjects of property. But it is not speaking with strict accuracy to say, that a property can be acquired in human beings, by local laws. Each state may, for its own convenience, declare that slaves shall be deemed property, and that the relations and laws of personal chattels shall be deemed to apply to them; as, for instance, that they may be bought and sold, delivered, attached, levied upon, that trespass will lie for an injury done to them, or trover for converting them. But it would be a perversion of terms to say, that such local laws do in fact make them personal property generally; they can only determine, that the same rules of law shall apply to them as are applicable to property, and this effect will follow only so far as such laws *proprio vigore* can operate.

The same doctrine is recognized in Louisiana. In the case of *Lunsford* v. *Coquillon*, 14 Martin's Rep. 402, it is thus stated : — " The relation of owner and slave is, in the States of this Union in which it has a legal existence, a creature of the municipal law." See Story's Conflict of Laws, 92, 97.

The same principle is declared by the court in Kentucky, in the case of *Rankin* v. *Lydia*, 3 Marshall, 470. They say, slavery is sanctioned by the laws of this State ; but we consider this as a right existing by positive law of a municipal character, without foundation in the law of nature.

The conclusion to which we come from this view of the law is this :

That by the general and now well established law of this Commonwealth, bond slavery cannot exist, because it is contrary to natural right, and repugnant to numerous provisions of the constitution and laws, designed to secure the liberty and personal rights of all persons within its limits and entitled to the protection of the laws.

That though by the laws of a foreign state, meaning by " foreign," in this connection, a state governed by its own laws, and between which and our own there is no dependence one upon the other, but which in this respect are as independent as foreign states, a person may acquire a property in a slave, such acquisition, being contrary to natural right, and effected by the local law, is dependent upon such local law for its existence and efficacy, and being contrary to the fundamental laws of this State, such general right of property cannot be exercised or recognized here.

That, as a general rule, all persons coming within the limits of a state, become subject to all its municipal laws, civil and criminal, and entitled to the privileges which those laws confer ; that this rule applies as well to blacks as whites, except in the case of fugitives, to be afterwards considered ; that if such persons have been slaves, they become free, not so much because any alteration is made in their *status*, or condition, as because there is no law which will warrant, but there are laws, if they choose to avail themselves of them, which prohibit, their forcible detention or forcible removal.

That the law arising from the comity of nations cannot ap-

ply ; because if it did, it would follow as a necessary conse-quence, that all those persons, who, by force of local laws, and within all foreign places where slavery is permitted, have acquired slaves as property, might bring their slaves here, and exercise over them the rights and power which an owner of property might exercise, and for any length of time short of acquiring a domicil ; that such an application of the law would be wholly repugnant to our laws, entirely inconsistent with our policy and our fundamental principles, and is therefore inad-missible.

Whether, if a slave, voluntarily brought here and with his own consent returning with his master, would resume his con-dition as a slave, is a question which was incidentally raised in the argument, but is one on which we are not called on to give an opinion in this case, and we give none.   From the princi-ple above stated, on which a slave brought here becomes free, to wit, that he becomes entitled to the protection of our laws, and there is no law to warrant his forcible arrest and removal, it would seem to follow as a necessary conclusion, that if the slave waives the protection of those laws, and returns to the state where he is held as a slave, his condition is not changed.

In the case of *The Slave, Grace*, 2 Haggard's Adm. R. 94, this question was fully considered by Sir *William Scott*, in the case of a slave brought from the West Indies to England, and afterwards voluntarily returning to the West Indies ; and he held that she was reinstated in her condition of slavery.

A different decision, I believe, has been made of the ques-tion in some of the United States ; but for the reasons already given, it is not necessary to consider it further here.

The question has thus far been considered as a general one, and applicable to cases of slaves brought from any foreign state or country ; and it now becomes necessary to consider how far this result differs, where the person is claimed as a slave by a citizen of another State of this Union.   As the several States, in all matters of local and domestic jurisdiction are sovereign, and independent of each other, and regulate their own policy by their own laws, the same rule of comity applies to them on these subjects as to foreign states, except so far as the respective rights and duties of the several States,

and their respective citizens, are affected and modified by the constitution and laws of the United States.

In *art.* 4, § 2, the constitution declares that no person held to service or labor in one State, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due.

The law of congress made in pursuance of this article provides, that when any person held to labor in any of the United States, &c. shall escape into any other of the said States or Territories, the person entitled, &c. is empowered to arrest the fugitive, and upon proof made that the person so seized, under the law of the State from which he or she fled, owes service, &c. Act of February 12, 1793, *c.* 7, § 3.

In regard to these provisions, the Court are of opinion, that as by the general law of this Commonwealth, slavery cannot exist, and the rights and powers of slave owners cannot be exercised therein ; the effect of this provision in the constitution and laws of the United States, is to limit and restrain the operation of this general rule, so far as it is done by the plain meaning and obvious intent and import of the language used, and no further. The constitution and law manifestly refer to the case of a slave escaping from a State where he owes service or labor, into another State or Territory. He is termed a fugitive from labor ; the proof to be made is, that he owed service or labor, under the laws of the State or Territory *from which he fled*, and the authority is given to remove such fugitive to the State *from which he fled*. This language can, by no reasonable construction, be applied to the case of a slave who has not fled from the State, but who has been brought into the State by his master.

The same conclusion will result from a consideration of the well known circumstances under which this constitution was formed. Before the adoption of the constitution, the States were to a certain extent, sovereign and independent, and were in a condition to settle the terms upon which they would form a more perfect union. It has been contended by some overzealous philanthropists, that such an article in the constitution

Common-<br>wealth<br>*v.*<br>Aves.

could be of no binding force or validity, because it was a stipulation contrary to natural right. But it is difficult to perceive the force of this objection. It has already been shown, that slavery is not contrary to the laws of nations. It would then be the proper subject of treaties among sovereign and independent powers. Suppose instead of forming the present constitution, or any other confederation, the several States had become in all respects sovereign and independent, would it not have been competent for them to stipulate by treaty that fugitive slaves should be mutually restored, and to frame suitable regulations, under which such a stipulation should be carried into effect ? Such a stipulation would be highly important and necessary to secure peace and harmony between adjoining nations, and to prevent perpetual collisions and border wars. It would be no encroachment on the rights of the fugitive ; for no stranger has a just claim to the protection of a foreign state against its will, especially where a claim to such protection would be likely to involve the state in war ; and each independent state has a right to determine by its own laws and treaties, who may come to reside or seek shelter within its limits, and to prescribe the terms. Now the constitution of the United States partakes both of the nature of a treaty and of a form of government. It regards the States, to a certain extent, as sovereign and independent communities, with full power to make their own laws and regulate their own domestic policy, and fixes the terms upon which their intercourse with each other shall be conducted. In respect to foreign relations, it regards the people of the States as one community, and constitutes a form of government for them. It is well known that when this constitution was formed, some of the States permitted slavery and the slave-trade, and considered them highly essential to their interest, and that some other States had abolished slavery within their own limits, and from the principles deduced and policy avowed by them, might be presumed to desire to extend such abolition further. It was therefore manifestly the intent and the object of one party to this compact to enlarge, extend and secure, as far as possible, the rights and powers of the owners of slaves, within their own limits, as well as in other States, and of the other party to limit and restrain them.

Under these circumstances the clause in question was agreed on and introduced into the constitution ; and as it was well considered, as it was intended to secure future peace and harmony, and to fix as precisely as language could do it, the limit to which the rights of one party should be exercised within the territory of the other, it is to be presumed that they selected terms intended to express their exact and their whole meaning; and it would be a departure from the purpose and spirit of the compact to put any other construction upon it, than that to be derived from the plain and natural import of the language used. Besides, this construction of the provision in the constitution, gives to it a latitude sufficient to afford effectual security to the owners of slaves. The States have a plenary power to make all laws necessary for the regulation of slavery and the rights of the slave owners, whilst the slaves remain within their territorial limits ; and it is only when they escape, without the consent of their owners, into other States, that they require the aid of other States, to enable them to regain their dominion over the fugitives.

But this point is supported by most respectable and unexceptionable authorities.

In the case of *Butler* v. *Hopper*, 1 Wash. C. C. Rep. 499, it was held by Mr. Justice *Washington*, in terms, that the provision in the constitution which we are now considering, does not " extend to the case of a slave voluntarily carried by his master into another State, and there leaving him under the protection of some law declaring him free." In this case, however, the master claimed to hold the slave in virtue of a law of Pennsylvania, which permitted members of congress and sojourners, to retain their domestic slaves, and it was held that he did not bring himself within either branch of the exception, because he had, for two years of the period, ceased to be a nember of congress, and so lost the privilege ; and by having become a resident could not claim as a sojourner. The case is an authority to this point, that the claimant of a slave, to avail himself of the provisions of the constitution and laws of the United States, must bring himself within their plain and obvious meaning, and they will not be extended by construction ; and that the clause in the constitution is confined to the

case of a slave escaping from one State, and fleeing to an-other.

But in a more recent case, the point was decided by the same eminent judge. *Ex parte Simmons*, 4 Wash. C. C. R. 396. It was an application for a certificate under § 3, of the act of February 12, 1793. He held that both the constitution and laws of the United States apply only to fugitives, escaping from one State and fleeing to another, and not to the case of a slave voluntarily brought by his master.

Another question was made in that case, whether the slave was free by the laws of Pennsylvania, which, like our own in effect, liberate slaves voluntarily brought within the State, but there is an exception in favor of members of congress, foreign ministers and consuls, and *sojourners :* but this provision is qualified as to sojourners and persons passing through the State, in such manner as to exclude them from the benefit of the exception, if the slave was retained in the State longer than six months. The slave in that case having been detained in the State more than six months, was therefore held free.

This case is an authority to this point ; — the general rule being, that if a slave is brought into a State where the laws do not admit slavery, he will be held free, the person who claims him as a slave under any exception or limitation of the general rule, must show clearly that the case is within such exception.

The same principle was substantially decided by the state court in the same State in the case of *Commonwealth* v. *Holloway*, 2 Serg. & Rawle, 305. It was the case of a child of a fugitive slave, born in Pennsylvania. It was held, that the constitution of the United States was not inconsistent with the law of Pennsylvania ; that as the law and constitution of the United States did not include the issue of fugitive slaves in terms, it did not embrace them by construction or implication. The court considers the law as applying only to those who *escape.* Yet by the operation of the maxim which obtains in all the States wherein slavery is permitted by law, *partus sequitur ventrem*, the offspring would follow the condition of the mother, if either the rule of comity contended for applied, or if the law of the United States could be. extended by construction.

The same decision has been made in Indiana. 3 American Jurist, 404.

In Louisiana, it has been held, that if a person with a slave, goes into a State to reside, where it is declared that slavery shall not exist, for ever so short a time, the slave *ipso facto* becomes free, and will be so adjudged and considered afterwards in all other States; and a person moving from Kentucky to Ohio to reside, his slaves thereby became free, and were so held in Louisiana. This case also fully recognizes the authority of States to make laws dissolving the relation of master and slave; and considers the special limitation of the general power, by the federal constitution, as a forcible implication in proof of the existence of such general power. *Lunsford v. Coquillon*, 14 Martin's Rep 403.*

And in the above cited case from Louisiana, it is very significantly remarked, that such a construction of the constitution and law of the United States can work injury to no one, for the principle acts only on the willing, and *volenti non fit injuria*.

The same rule of construction is adopted in analogous cases in other countries, that is, where an institution is forbidden, but where for special reasons and to a limited extent such prohibition is relaxed, the exemption is to be construed strictly, and whoever claims the exemption, must show himself clearly within it, and where the facts do not bring the case within the exemption, the general rule has its effect.

By a general law of France, all persons inhabiting or being within the territorial limits of France are free. An edict was passed by Louis XIV. called "Le Code Noir," respecting slavery in the colonies. In 1716, an edict was published by Louis XV., concerning slavery in the colonies, and reciting among other things, that many of the colonists were desirous of bringing their slaves into France, to have them confirmed in the principles of religion, and to be instructed in various arts

---

* *Marie Louise* v. *Marot et al.* 9 Curry's (Louisiana) R. 473. "The fact of a slave being taken to the kingdom of France or other country, by the owner, where slavery or involuntary servitude is not tolerated, operates on the condition of the slave and produces immediate emancipation. Where a slave becomes free by the laws of another country or state to which he is taken by the owner, it is not in the power of the latter ever again to reduce him to slavery." See also *Nancy Jackson* v. *Bulloch* 12 Connect. R. 38, *Julia* v. *M'Kinney*, 3 Missouri R. 270.

and handicrafts, from which the colonists would derive much benefit on the return of the slaves, but that many of the colonists feared that their slaves would pretend to be free on their arrival in France, from which their owners would sustain considerable loss, and be deterred from pursuing an object at once so pious and useful. The edict then provides a series of minute regulations to be observed, both before their departure from the West Indies, and on their arrival in France, and if all these regulations are strictly complied with, the negroes so brought over to France shall not thereby acquire any right to their freedom, but shall be compellable to return ; but if the owners shall neglect to comply with the prescribed regulations, the negroes shall become free, and the owners shall lose all property in them. 20 Howell's State Trials, 15, note.

The constitution and laws of the United States, then, are confined to cases of slaves escaping from other States and coming within the limits of this State without the consent and against the will of their masters, and cannot by any sound construction extend to a case where the slave does not escape and does not come within the limits of this State against the will of the master, but by his own act and permission. The provision is to be construed according to its plain terms and import, and cannot be extended beyond this, and where the case is not that of an escape, the general rule shall have its effect. It is upon these grounds we are of opinion, that an owner of a slave in another State where slavery is warranted by law, voluntarily bringing such slave into this State, has no authority to detain him against his will, or to carry him out of the State against his consent, for the purpose of being held in slavery.

This opinion is not to be considered as extending to a case where the owner of a fugitive slave, having produced a certificate according to the law of the United States, is *bonâ fide* removing such slave to his own domicil, and in so doing passes through a free State ; where the law confers a right or favor, by necessary implication it gives the means of enjoying it. Nor do we give any opinion upon the case, where an owner of a slave in one State is *bonâ fide* removing to another State where slavery is allowed, and in so doing necessarily passes

through a free State, or where by accident or necessity he is compelled to touch or land therein, remaining no longer than necessary. Our geographical position exempts us from the probable necessity of considering such a case, and we give no opinion respecting it.

The child who is the subject of this *habeas corpus*, being of too tender years to have any will or give any consent to be removed, and her mother being a slave and having no will of her own and no power to act for her child, she is necessarily left in the custody of the law. The respondent having claimed the custody of the child, in behalf of Mr. and Mrs. Slater, who claim the right to carry her back to Louisiana, to be held in a state of slavery, we are of opinion that his custody is not to deemed by the Court a proper and lawful custody.

Under a suggestion made in the outset of this inquiry, that a probate guardian would probably be appointed, we shall for the present order the child into temporary custody, to give time for an application to be made to the judge of probate.