COMMONWEALTH vs. FLETCHER W. TITUS.

No. 91-P-88.

Essex. January 7, 1992. - March 10, 1992.

Present: SMITH, JACOBS, & GILLERMAN, JJ.

*Kidnapping. Practice, Criminal*, Required finding, Instructions to jury, *Evidence*, Fresh complaint, Other offense, State of mind, Flight, Consciousness of guilt. *Rape*.

At the trial of a kidnapping indictment, the evidence was sufficient for the jury reasonably to infer that the defendant intended forcibly to confine the victim against her will. [219-221]

At a criminal trial, there was no error in the judge's instruction to the jury on the charge of kidnapping. [221]

At the trial of indictments for rape, the judge properly allowed certain "fresh complaint" testimony, where he determined that the complaints were made reasonably promptly (two months) after the victim ceased to be under the defendant's control. [221-223]

At the trial of rape indictments, there was no error in the judge's instructions, taken as a whole, on the issue of fresh complaint. [223-224]

At the trial of rape indictments, the evidence of penetration was sufficient to support findings of guilty, and other evidence of the circumstances attendant to the defendant's flight was admissible to demonstrate his consciousness of guilt. [224-226]

INDICTMENTS found and returned in the Superior Court Department on November 30, 1988.

The cases were tried before *John T. Ronan*, J.

*George E. Hazel* for the defendant.

*William J. Meade*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. An Essex County grand jury returned four indictments against the defendant, Fletcher Titus, each alleging three counts of rape of a child under sixteen years of age, G. L. c. 265, § 23; one indictment for kidnapping in violation of G. L. c. 265, § 26, and one indictment for threatening to commit a crime in violation of G. L. c. 275,

§ 2.[1] Following two trials the defendant was found guilty on each count of each indictment.[2] The defendant was sentenced to four concurrent terms of nine to fifteen years at M.C.I., Cedar Junction, on all counts of the statutory rape indictments, and a sentence of nine to ten years on the kidnapping charge to run concurrently with the rape sentences.

On appeal, the defendant makes the following claims: (1) the evidence presented was insufficient to support a conviction of kidnapping; (2) the judge erroneously instructed the jury on the crime of kidnapping; (3) the judge erred in admitting "fresh complaint" testimony; (4) the judge incorrectly instructed the jury on its consideration of "fresh complaint" testimony; (5) the Commonwealth failed to present sufficient evidence to support a conviction of rape of a child; and (6) the admission of the defendant's "bad acts" was improper and highly prejudicial. We affirm the defendant's convictions.

The jury could have found the following facts.[3] The defendant married the victim's mother when the victim, whom we shall call Ann, was eight years old. Ann, her mother, and the defendant lived together in the same house on King Street in Groveland until Ann moved out after she turned eighteen in the summer of 1988.

On November 5, 1988, several months after she had moved out of the King Street house, Ann was in her car with a friend when she noticed that she was being followed closely by the defendant in his automobile. Ann got out of her car and approached the defendant's vehicle. He yelled at her and

---

[1] The defendant's conviction for threatening to commit a crime was placed on file with the defendant's consent and is therefore not before this court. See *Commonwealth* v. *Haggerty*, 400 Mass. 437, 438 n.3 (1987).

[2] At the first trial the defendant was found guilty of kidnapping and threatening to commit a crime. The jury were unable to reach a unanimous verdict on the indictments charging the defendant with rape of a child. The rape charges were retried and the defendant was found guilty on each count of the retried indictments.

[3] The evidence relating to the kidnapping charge is drawn from the first trial while the evidence regarding the rape charges is drawn from the second trial. The evidence at the second trial was substantially the same as the evidence at the first trial.

told her to return to the King Street house. Ann, frightened and uncertain about what was going to happen, returned to the house and instructed her friend to walk up and down King street and to keep an eye out for her.

Immediately upon her arrival at the house, Ann recognized that the situation was "intense and that something was wrong." At the defendant's urging, Ann's mother asked her if she had undergone an abortion. Ann admitted to the abortion and asked the defendant to leave the room so she could have a private conversation with her mother. Ann informed her mother, out of the defendant's presence, that the defendant had been sexually "molesting" her for years.[4] When the defendant returned to the room, the victim's mother confronted the defendant with Ann's accusation. The defendant admitted to sexual activity with Ann.

The conversation then moved to a downstairs living room where the defendant threatened Ann that "[you] don't have to worry about anything any more after tonight." A short while later, the defendant told Ann "all right, let's go." As the defendant and Ann left the house, Ann said to her mother, "I don't want to die." Her mother did not reply, and Ann and the defendant walked to Ann's car, the defendant following closely behind Ann. As they reached the car the defendant asked her for the keys. Ann told him that they were inside the house. The defendant followed ·her to and from the house as she went to retrieve the car keys. Ann was "horrified" and "scared" of the defendant; she contemplated running from the defendant, but believed it would be futile.

The defendant instructed Ann to enter the passenger side of the car. She did so and the defendant sat on the driver's

___

[4] At trial, the victim testified in detail that the assaults began at the age of nine when the defendant began touching her on the breasts and vagina. The series of assaults increased in invasiveness as the victim grew older. The victim testified that beginning at the age of thirteen the defendant's sexual "touchings" changed and he began to "put his penis into [her] vagina." The defendant's almost daily acts of oral and vaginal rape of his stepdaughter continued up until the victim turned eighteen and moved out of the family residence. When she was quite young, the defendant told the victim not to reveal his abuse or else she "would go to a bad place."

side and drove away from the house. As the car pulled out of the driveway, the defendant asked Ann if she "wanted to know how he was going to kill [her]." According to Ann the defendant then said he "was going to stop the car, smash my head into the windshield, and hopefully I would die with that action; because he was going to crash the car, and it would be more painful when he did that." The defendant drove the car to Georgetown Square, pulled the car into a Citgo gas station, and told Ann that he was going to kill her in another car. As she stepped out of the car, she seized the opportunity to escape, ran inside the gas station office, and asked the attendant to phone the police because someone was trying to kill her. At this moment, the defendant entered the office and told the attendant that it was a "family matter" and not to call the police. The defendant grabbed Ann's arm and pulling it behind her back forced her out the door. When they were outside the office Ann managed to pry herself loose and ran to safety inside a nearby market.

Milton Randall, the store manager, brought Ann to a back room and called the police. Officer Daniel Beaton of the Georgetown police was the first to arrive on the scene and testified that Ann "was shaking and crying very, very loudly." Ann told Beaton that her father had threatened to kill her and that she was "afraid her father was going to take her." Ann accompanied Beaton to the police station where she told him that the defendant had been having sex with her for the past five or six years. Two days after the above events transpired Ann met with Officer William Sargent of the Groveland police department and told him in considerable detail that the defendant had sexually abused her since the age of nine.

## I. *The Kidnapping Trial.*

1. *Sufficiency of evidence on the charge of kidnapping.* At the close of the Commonwealth's case, the judge denied the defendant's motion for a required finding of not guilty on the charge of kidnapping. The familiar test is whether, after viewing the evidence in the light most favorable to the Com-

monwealth, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979).

The indictment (possibly combining clauses [1] and [3] of G. L. c. 265, § 26[5]) contained language which required the Commonwealth to prove that the defendant forcibly confined or imprisoned Ann "with intent . . . to cause her to be secretly confined or imprisoned . . . against her will."[6] The defendant's contention is that the Commonwealth failed to prove that the defendant intended to cause the victim to be secretly confined or imprisoned against her will.

Even if we regard the "intent" language of the indictment as not surplusage, but see *Commonwealth* v. *Ware*, 375 Mass. 118, 120 (1978) (intimating that the "intent" language in an indictment based on the third clause might be regarded as superfluous where the remaining language of the indictment is sufficient to embrace the first clause), there was sufficient evidence from which the jury could have found beyond a reasonable doubt that the defendant forcibly confined or imprisoned Ann with the intent to cause her to be secretly confined or imprisoned against her will.

The jury could have considered the following: the victim testified that she was "scared" of the defendant and that an

---

[5]The first sentence of G. L. c. 265, § 26, as appearing in St. 1971, c. 900, reads in part as follows: "[1] Whoever, without lawful authority, forcibly or secretly confines or imprisons another person within this commonwealth against his will, or [2] forcibly carries or sends such person out of this commonwealth, or [3] forcibly seizes and confines or inveigles or kidnaps another person, with intent . . . to cause him to be secretly confined or imprisoned in this commonwealth against his will. . . ." See *Commonwealth* v. *Ware*, 375 Mass. 118, 119-120 n.1 (1978).

[6]The indictment in its entirety reads as follows: "Fletcher W. Titus . . . at Groveland . . . without lawful authority, did forcibly confine or imprison one [Ann], within this Commonwealth against her will, with intent either to cause her to be secretly confined or imprisoned in this Commonwealth against her will, or to cause her to be in any way held to service against her will." The phrase "held to service against her will" first appeared in Rev. Sts. (1836) c. 125, § 20, and was connected to the process of slavery. See *Commonwealth* v. *Saylor*, 27 Mass. App. Ct. 117, 120 n.2 (1989). The phrase may now be regarded as surplusage in any indictment.

escape would be "futile"; that Ann, because of her fear of the defendant, obeyed his instructions to leave the house and to sit on the passenger side of her car while the defendant was in control of the vehicle; that the defendant drove the vehicle away from the house against the will of the victim; that she was held inside the vehicle against her will and was unable to escape from the vehicle; that after the defendant had admitted to years of sexual contact with Ann the defendant threatened to kill her and told her that he was going to "smash [her] head against the windshield"; that after that night she would not have to worry about anything; that Ann finally managed to escape only by fleeing from the defendant's grasp when the vehicle stopped in Georgetown, and that thereafter she was shaking and sobbing.[7] These facts provide sufficient evidence from which the jury could reasonably infer that the defendant intended forcibly to confine the victim against her will. See *Commonwealth* v. *Nelson*, 370 Mass. 192, 203 (1976) (evidence need not require the jury to draw an inference, it is sufficient that the evidence permits the inference to be drawn); *Commonwealth* v. *Frankoff*, 16 Mass. App. Ct. 433, 446 (1983).

2. *Jury charge.* The defendant contends that the judge failed properly to instruct the jury on kidnapping by incorrectly defining the word "force" in response to a jury question. Assuming the point was properly preserved by the defendant, there was no error. The judge correctly noted that there need not be physical force applied against the victim; if the victim is subdued by the "display of potential force, [that] is sufficient. . . ." See *Commonwealth* v. *Cavacciola*, 409 Mass. 648, 652 (1991) ("force" may be either actual or constructive).

The judge's reference to the word "inveigle" did not mislead the jury. The judge read the kidnapping statute in its entirety and it includes the word "inveigle." The judge also

---

[7]The defendant claims that, because the indictment avers that the kidnapping occurred in Groveland, the jury should not have been allowed to consider the events which took place in Georgetown. There is no merit to the argument. See G. L. c. 265, § 27.

told the jury that the confinement must be against the person's will — the "[e]ssence [of kidnapping] is restraint, restraint of locomotion." "The test of the charge is the impression created by it as a whole. . . ." *Commonwealth* v. *Benders*, 361 Mass. 704, 707 (1972). Thus considered, the defendant's claims must fail.

## II. *The Rape Trial.*

1. *Admissibility of the "fresh" complaints.* The defendant claims that the trial judge erred in allowing the "fresh complaint" testimony of Officers Beaton and Sargent concerning the victim's out-of-court statements made to them detailing the defendant's acts of rape and abuse. The defendant calculates that the statements were made some twenty-seven months after the date of the last putative event, July 14, 1986, rather than the two months that expired measured from the date that Ann left the King Street house. There was no abuse of discretion on the part of the judge in admitting the corroborative testimony of the officers.

Whether a complaint is reasonably "fresh" "rests in the first instance in the sound discretion of the trial judge." *Commonwealth* v. *Hyatt*, 31 Mass. App. Ct. 488, 491 (1991). Significant delays have been excused when the victim is a child. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 229 (1989); *Commonwealth* v. *Dion*, 30 Mass. App. Ct. 406, 414 (1991); *Commonwealth* v. *Hyatt, supra*, at 491. "The test is whether the victim's actions were reasonable in the particular circumstances of the case." *Commonwealth* v. *Amirault, supra* at 228. In considering the issue, the courts have looked to the following criteria: when did the victim leave the control of the defendant, was the perpetrator of the offense related to the victim (parent or stepparent of the victim), and did the defendant obtain the victim's silence through the use of threats, implied or expressed? *Id.* at 229. *Commonwealth* v. *Hyatt, supra* at 491.

The trial judge properly concluded that Ann's complaints, made approximately two months after she left the defendant's house, were sufficiently "fresh." In *Commonwealth* v.

*Comtois*, 399 Mass. 668, 672 n.9 (1987), the court found that "[i]n cases where a young victim has been under the control of, and in reasonable fear of, a defendant who is a close relative, the promptness of a complaint is usually measured from the date when the victim leaves the defendant's control." Here, the victim ceased being under the defendant's control only two months prior to her statements, the defendant was Ann's stepfather, and when Ann was very young he had threatened her with going to a "bad place." The almost daily sexual assaults, see note 4, *supra*, kept Ann within the defendant's grasp until she left the house. The judge was well within his discretion in allowing the officers to give corroborative testimony. See *Commonwealth* v. *Hyatt*, *supra* at 490-492 (complaint given some two years after rape properly admitted); *Commonwealth* v. *Dion*, *supra* at 414 (noting the difference between cases involving a single putative event, and those where, as here, the claim is that there were repeated acts of abuse).

2. *The judge's instruction to the jury concerning fresh complaint testimony.* The defendant claims for the first time on appeal that the judge failed to submit to the jury the question whether the complaint was "fresh." The defendant failed to object either to the judge's jury instructions or to his limiting instructions on the issue of fresh complaint. If there was error, our review would be confined to a determination whether there is a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967).

During the course of the trial, as well as during his final charge, the judge instructed the jury concerning the proper use of fresh complaint testimony. The judge instructed the jury that the statements were admissible only as corroborative evidence and that they could not be used to prove that the victim was in fact sexually assaulted. The judge also told the jury that the statements were "admitted solely to give you, if they do give you, assistance — if they are in fact an assistance." He also told the jury that they could "weigh the absence of a fresh complaint. Perhaps it ought to be called a stale complaint doctrine. But this issue of staleness, that also

can be weighed. . . ." By referring to the doctrine as the "stale complaint" doctrine the judge implicitly instructed the jury that it was within their province to decide whether the complaints had been made within a reasonable time period. Taken as a whole the judge's instructions on the issue of fresh complaint were adequate. See *Commonwealth* v. *Dockham*, 405 Mass. 618, 626-27 (1989); *Commonwealth* v. *Densten*, 23 Mass. App. Ct. 981, 982 (1987) ("Although . . . the judge's instructions could have been more explicit, we think, when read as a whole, they adequately conveyed to the jury that it was for them to determine whether the victim's complaint to his mother was made within a reasonable time").

3. *Other points.* The defendant raises two additional points. First, the defendant claims that the Commonwealth did not present sufficient evidence to support a conviction of rape of a child under sixteen years of age. G. L. c. 265, § 23. The defendant argues that the victim provided no testimony that any acts of penetration occurred within the time frame of the indictments, and that her repeated reference to having "sex" with the defendant was insufficient to warrant a finding of penetration. The defendant's arguments are unpersuasive.

The rape indictments allege that the defendant began having natural or unnatural intercourse with the victim sometime on or after July 15, 1983. This date corresponds to Ann's thirteenth birthday. During trial, the victim testified that sometime after she got her first menstrual period, which occurred when she was thirteen, the defendant's "touchings" changed. She testified that at that time "he put his penis into my vagina." Following this testimony, she stated that the defendant would have "sex" with her on a daily basis. "[T]he evidence in this case, together with the reasonable inferences that could be drawn therefrom, was adequate to warrant a finding by the jury of penetration." *Commonwealth* v. *Nylander*, 26 Mass. App. Ct. 784, 787 (1989) (citations omitted). See *Commonwealth* v. *Nelson*, 17 Mass. App. Ct. 947, 948 (1983) (jury could reasonably infer that victim's use of

the term "sexual relations" was synonymous with sexual intercourse).

The defendant also claims that during his trial on the rape indictments (the defendant had been convicted of kidnapping in the first trial, see note 2, *supra*) the judge improperly admitted evidence pertaining to the kidnapping. The events which unfolded on the evening of November 5, 1988, were irrelevant, so the argument continues, and highly prejudicial to the issue whether the defendant raped his stepdaughter. The judge admitted the testimony as evidence of consciousness of guilt on the part of the defendant. There was no error.

While evidence of a defendant's prior bad conduct — here, the kidnapping — is ordinarily not admissible to show his criminal propensity, "[e]vidence that tends to show consciousness of guilt on the part of a defendant is always relevant at trial." *Commonwealth* v. *Roberts*, 378 Mass. 116, 125 (1979). Evidence otherwise relevant is not rendered inadmissible merely because it may indicate that the defendant had committed another offense. *Ibid.* After Ann revealed the defendant's actions to her mother, the defendant forcibly led her to her car, drove her away and told her that he was going to kill her. Following Ann's escape, the defendant fled to a friend's house where he spent the night. According to the friend, the defendant said, "Well, he says, you know — 'The police may be looking for me.' He said . . . [Ann], his daughter there, accused him of having sex with her, in front of her mother, and he took her out, took her for a ride to try and straighten things out, I guess." The events relating to the charge of rape were interwoven with the events relating to the kidnapping charge. The judge properly admitted the testimony of the friend in order to show the defendant's guilty state of mind, and the testimony of other witnesses about events of that evening was admitted to show the "attendant circumstances." See *Commonwealth* v. *Longo*, 402 Mass. 482, 489 (1988). "We believe that the desperate nature of the defendant's conduct here lent credibility to the Commonwealth's argument that the evidence of flight supported an

inference of guilt of the crimes charged." *Commonwealth* v. *Gilday*, 367 Mass. 474, 496 (1975).

*Judgments affirmed.*