COMMONWEALTH *vs.* JAMES RIDGE. No. 94-P-77. November 7, 1994. *Controlled Substances. Evidence*, Prior misconduct, Motive, Consciousness of guilt.

The defendant was convicted by a jury of larceny of property (cocaine) in value more than $250 (G. L. c. 266, § 30) and trafficking in cocaine in excess of 200 grams (G. L. c. 94C, § 32E[*b*][3]), as appearing in St. 1983, c. 571, § 3. On appeal, the defendant claims that the evidence was insufficient for the jury to find that he intended to traffic in cocaine. He also contends that the trial judge committed reversible error by allowing the jury to hear evidence of two "bad acts." We affirm.

In late April or early May, 1986, Gerald Murphy flew to Fort Meyers, Florida, to pick up a large quantity of cocaine. Murphy's companion Scott Garlington went ahead in Murphy's car which the two would use to drive the drugs back into the Commonwealth. The defendant was aware of the

objectives of Murphy's trip, and Murphy promised to call when he returned to the area with the drugs.

Murphy and Garlington returned to Mashpee with three large zip-lock bags full of cocaine, with a total weight between six and eight pounds and an estimated value of $350,000. Murphy wrapped the three plastic bags and placed them into two gym bags along with a digital scale, Inositol for diluting the cocaine, spoons, knives, screens, a bag sealer, and a box of smaller plastic baggies. Murphy arranged to store the two gym bags with his next-door neighbor, Lyons, fearing a drug raid by the police. Lyons stored approximately seven or eight pounds of cocaine for Murphy, and Murphy allowed Lyons to take cocaine out of the stash in the gym bags for his personal use as consideration for the use of Lyons' house for storage.

On the morning of May 18, 1986, Murphy told Lyons to bring the two bags over to Murphy's house. When Lyons arrived, Murphy and the defendant were present. The three opened the gym bags and looked at the contents, including the drugs and paraphernalia. There were at least three pounds of cocaine remaining in the gym bags at that time, Murphy having sold and given some of the drugs away. Following a brief discussion, Murphy and the defendant departed together in Murphy's car and Lyons returned home.

Soon thereafter, the defendant returned to Lyons' house requesting the two gym bags. Lyons reminded the defendant that the bags were still in Murphy's kitchen. The defendant, accompanied by Lyons, walked next door to Murphy's house and took the bags. Just before he was about to drive away, the defendant asked Lyons to point out which of the plastic bags of cocaine were already "cut" (diluted with the Inositol and ready for sale) and which were not. The defendant then drove off in his car with the two gym bags full of cocaine and drug paraphernalia.

While driving down Quinaquissett Road in Mashpee, the defendant threw the two gym bags out the car window and onto the side of the roadway. He later told a number of his friends that while he was driving off he had suddenly become paranoid about police officials following him and decided to throw the gym bags onto the road to avoid being caught. Two women later saw the bags, took them and turned them over to the police. Laboratory analysis revealed a total of 636.8 grams of cocaine. The bags also contained an electronic scale, spoons, knives, Inositol cutting powder, and a box of plastic baggies.

Upon reading the story of the drug find in the local newspaper, Murphy approached the defendant and inquired why he had taken the drugs from his home. The defendant explained that he believed that police were patrolling Murphy's neighborhood and were closing in on Murphy's house, and so he took the drugs for the purposes of safekeeping and to protect Murphy. The defendant told his friend Harrington a similar story. The defendant explained to Sweeney, another friend, that his fear of police presence in Murphy's neighborhood stemmed from an earlier attempt to

steal drugs from a boat which was thwarted when people the defendant believed to be Federal Bureau of Investigation (F.B.I.) agents chased Murphy and the defendant from the area. The defendant told Sweeney that he took the drugs from Murphy's house because the "heat was on" and he wanted to protect the cocaine and Murphy from a drug raid, and then had discarded the cocaine out of fear that the police were trailing him. However, Garlington testified that when he questioned the defendant about the drugs after the newspaper story, the defendant told him that he told Lyons that Murphy was "making a fool of Lyons" by supplying Lyons with only a minimal amount of cocaine in return for the danger of keeping the drugs in Lyons' house, and that the defendant would "take care of Lyons" when the defendant finally had the drugs.

1. *Sufficiency of the evidence.* Contrary to the contentions of the defendant, the evidence was sufficient to allow a rational jury to find beyond a reasonable doubt the element of intent to distribute cocaine. See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). First, the possession of 636.8 grams of cocaine is wholly inconsistent with personal use, and was alone an amount sufficient to warrant the inference beyond a reasonable doubt that the defendant intended to distribute cocaine in violation of G. L. c. 94, § 32E (*b*)(3). See *Commonwealth* v. *Poole*, 29 Mass. App. Ct. 1003, 1004 (1990), and cases cited. See also *Commonwealth* v. *Fogarty*, 25 Mass. App. Ct. 693, 701 (1988); *Commonwealth* v. *Healis*, 31 Mass. App. Ct. 527, 532 (1991). Moreover, evidence that the defendant also possessed at the same time drug paraphernalia such as Inositol cutting powder, a digital scale, a box of small baggies and a bag sealer supports this inference. *Commonwealth* v. *LaPerle*, 19 Mass. App. Ct. 424, 427 (1985). The jury could also infer that the defendant intended to distribute cocaine from the evidence that he specifically asked Lyons to show him which package of cocaine was "cut" and prepared for sale prior to driving away with the bags. *Ibid.* In addition, the fact that the defendant told Lyons that he "would take care of him" when the defendant got hold of the drugs from Murphy since Murphy was "making a fool of" Lyons by paying him little for the risk of storing the cocaine at his house warrants the inference that the defendant intended to reward Lyons in cocaine or money derived from selling the cocaine. Finally, the defendant's admissions to numerous parties that he took the drugs in order to keep them safe until returned to Murphy is sufficient to satisfy the element of intent to distribute. See *Commonwealth* v. *Poole*, 29 Mass. App. Ct. at 1004.

2. *Prior bad acts.* We cannot say that the Superior Court judge erred as matter of law in admitting evidence of what could be described as "bad acts" of the defendant for purposes other than proving the defendant's bad character. First, the witness Sweeney, a friend of the defendant, said that following the transaction in 1986, the defendant explained to him why he had taken the drugs from Murphy and then discarded the bags of cocaine in the roadway. The defendant told Sweeney that he and Murphy were at

a local boat yard staking out a boat carrying drugs which they planned to "rip-off" when men approached the pair and ordered them to leave the premises. The defendant believed that these men were F.B.I. agents. As a result of the encounter at the boat yard, the defendant became fearful that the police were closing in on Murphy's neighborhood. The defendant further explained to Sweeney that he took the drugs from Murphy's house in order to protect the cocaine and Murphy from what he believed was an impending police raid. The acts of the defendant flowed from his fear of police presence which originated at the boat yard during the rip-off scheme. The boat rip-off scheme was relevant and properly admitted for the purposes of showing the defendant's motive for taking the drugs from Murphy. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). This evidence of the defendant's state of mind was probative on the trafficking charge since it showed that he intended to deliver the cocaine to Murphy when "the heat was off." See *Commonwealth* v. *Poole, supra.*

Second, the witness Garlington testified that while the police investigation was closing in on the defendant in 1989, the defendant approached Garlington at his place of work demanding to know the whereabouts of Murphy and Sweeney. The defendant also warned Garlington that Sweeney and Murphy had "fucked with the wrong people," and referred to Murphy as "a rat" and "a dead man" for providing information to the police during the investigation of the defendant in regard to the charges for which he was indicted and tried. The evidence of the threats of the defendant against Murphy and Sweeney was properly admitted for the purpose of showing the defendant's consciousness of guilt. See *Commonwealth* v. *Titus*, 32 Mass. App. Ct. 216, 225 (1992). The judge ascertained that the only link between the defendant, Garlington, Sweeney, and Murphy was to the case on trial, and that the threats levied by the defendant specifically suggested retribution for information provided to police concerning the defendant's commission of the crimes for which he was currently being tried and not some other independent event.

In admitting both pieces of testimony, the trial judge, at side-bar conferences, took care to determine their probative value against prejudicial effect and in this respect there was no "palpable error." *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981). In any event, in light of the overwhelming evidence against the defendant based in significant part on the defendant's admissions to a number of people that he indeed had possessed the large quantity of cocaine before discarding it on the road, any error was insignificant. See *Commonwealth* v. *Zagranski*, 408 Mass. 278, 288 (1990).

*Judgments affirmed.*

*James R. Rosencranz* for the defendant.
*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.