## COMMONWEALTH *vs.* PAUL M. DION.

No. 90-P-525.

Middlesex. January 17, 1991. - March 29, 1991.

Present: KASS, KAPLAN, & PORADA, JJ.

*Rape. Evidence*, Fresh complaint. *Witness.* Competency.

At the trial of an indictment for rape of a child under the age of sixteen, the judge erred in admitting evidence of a "fresh complaint" made eighteen months after the alleged event, where there was no evidence of threats or intimidation and an assertion of generalized fear on the complainant's part was negated by him; in the circumstances the error was material and the defendant was entitled to a new trial. [413-414]

INDICTMENT found and returned in the Superior Court Department on February 15, 1989.

The case was tried before *John P. Forte*, J., sitting under statutory authority.

*Peter T. Elikann* for the defendant.

*Wendy Murphy*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant Dion appeals from a judgment of conviction of the crime of rape of a child under the age of sixteen (G. L. c. 265, § 23), entered upon the verdict of a Middlesex jury.[1]

At oral argument of the appeal before us, counsel for the Commonwealth said, with commendable candor, "It's amazing we won this."[1a]

We describe the case in some detail in order to see whether the "victory" is fairly tenable upon appellate review.

---

[1] The defendant was also indicted for indecent assault and battery of a child under the age of fourteen (G. L. c. 265, § 13B), but the court dismissed this indictment as duplicative of the rape charge. See *Commonwealth* v. *Thomas*, 401 Mass. 109, 119-120 (1987).

[1a] The context of that remark was a colloquy between the court and counsel about the difficulty of questioning an impaired victim-witness at trial. We do not intimate that the government was cavalier in prosecuting a difficult case.

It is accepted that on August 10, 1988, John Smith (pseudonyms are used throughout), then fourteen years old, told his mother that his older brother Leonard, then fifteen, had told him that day that, at an unspecified time in the past, the defendant Dion had "put his private in my [Leonard's] butt."[2] The mother repeated to Leonard what John had told her. Mother, father, and John went promptly to the police station; two officers visited that evening at the Smith home; the following day mother, father, John and Leonard were interviewed, all four together, apparently, by Officer George Thomas Sullivan, and a statement was prepared and signed.

No further police work was done. Thus, although, according to John, his friend Morris Cato was present when Leonard spoke, the police did not interview Cato, who was available. Officer Sullivan did tell the mother to have Leonard examined by a physician, but he did not follow up whether this was done.[3] Grand jury indictment was not obtained until February 15, 1989, six months after the accusation in August. The police did not attempt any communication with the defendant. He first learned of the trouble he was in around the time of his arraignment on March 9, 1989.

The indictment stated that the criminal event occurred sometime between January 1 and May 1, 1987. Defendant's counsel requested particulars. Particulars were given only to the effect that it was after school in the afternoon.

On trial day in August, 1989, before jury empanelment, the defendant brought up his motion to dismiss the indictment on the ground that the four-month period mentioned was excessively broad and this exacerbated the difficulty of making a defense, especially because Leonard was mentally

---

[2]John testified that Leonard told him the defendant had "fucked me [Leonard] up the ass," but John modified the language in reporting to his mother. In his testimony in which he had been schooled (see *infra*), Leonard used the modified language.

[3]The mother did not have Leonard examined for the possible effects of penetration, as she thought a lengthy time had passed and Leonard was not complaining. There was an examination of Leonard for AIDS (result negative).

retarded and cross-examination of him could not serve its normal function. The prosecutor said he had interviewed Leonard a half dozen times to try to fix the time more closely, but without result. He explained the May 1, 1987, end date by his belief that the defendant was then incarcerated, but there is little of record to support the January 1, 1987, beginning date. The putative offense could have occurred earlier, thus extending further the possible interval between the offense and the accusation, the so-called "fresh complaint." From the subsequent trial record, it appears that Leonard indicated he was thirteen years old when he was molested, but this would allow his thirteenth birthday, June 7, 1986, to serve as the beginning date. The problem was not much helped by Leonard's mention of June, Valentine's day, a day that started cold and ended warm, each supposed to approximate to the time of the offense; he also said it did not happen before Christmas, after Christmas, or on Christmas; he was generally vague about dates and times.[4]

At all events, the judge denied the motion to dismiss the indictment. The defense moved for voir dire to test whether Leonard's "complaints" were or were not "fresh," and thus to be admitted or excluded, but the judge said he would rather see how the evidence went. In response to cross-motions on the subject of the use of prior convictions to impeach the defendant, the judge ruled from the start that he would admit convictions of "dissimilar" offenses (there were no convictions of similar, i.e. sex-related offenses).

In his speech to the jury after empanelment, the prosecutor made two statements of some consequence. He said the proof would show that the defendant took Leonard's hand and led him from the TV room to the living room where the act took place; and that it was when a new family moved into the nearby house, in which the defendant's family had resided, that Leonard spoke to John.

---

[4]We appreciate fully that mental deficiency, in some cases, might make a person vulnerable to sexual abuse and also make the person a poor witness.

The judge saw the need for a preliminary examination of Leonard's competence as a witness, and a voir dire on the subject was held as Leonard was about to be called as the Commonwealth's first witness. Leonard was a "special needs" student in a vocational high school. He could sign his name, count to one hundred, recite the alphabet, perhaps write a sentence, but was much limited: the prosecutor (without scientific help) ventured a guess that Leonard was at the level of a seven or eight year old. He was learning at school the seven steps in cleaning a floor, which he was glad to recite. Since he could not articulate well in connected speech, questions often had to be put to him in "leading" form, to which he generally would respond by yes, no, I forgot, etc.[5] He could be led easily; thus, to questions by the prosecutor he would say yes, and to like questions by defense counsel, no. However, it was reasonably inferable from Leonard's voir dire examination (and more so from his testimony) that he had been schooled in certain questions the prosecutor would ask and in the answers expected of him. He held firmly, again and again, to the formula that lying gets you into trouble. But this impelled him to affirm that he had never lied in all his sixteen years. The judge ruled that Leonard was competent, but it seemed no more than a minimal competence.[6]

The prosecution drew from Leonard the details that, on the day, after returning home from school (customarily this was at 2:30 P.M.), and before John's return (say at 3:30), he and the defendant — his former babysitter — watched TV; then Leonard walked out of the room to the living room, followed, not led, by the defendant; Leonard lay face down on the sofa there; the defendant drew down Leonard's jeans and underwear, and inserted his penis in Leonard's anus. It hurt only a little. There was no indication of resistance on Leo-

[5]The Commonwealth moved to be permitted to use leading questions. The judge did not rule, but leading questions were used liberally.

[6]At one point the judge mentioned the need to assure that Leonard understood the meaning of an oath; then he found that Leonard did understand the oath; later he said he didn't think Leonard knew what "under oath" meant.

nard's part, and nothing was said during the episode. The defendant went to the bathroom and then left the house. Leonard pulled up his clothes and resumed watching TV. As noted, it was hard for cross-examination regarding this testimony to be truly searching or to produce any telling effects, precisely because of the witness's limitations. He could not say whether the penetration lasted a short or a long time. In response to the prosecutor, he answered, yes, he was afraid of the defendant then (and was still afraid), but his answer to defendant's counsel was to the contrary. He had visited at the Dions' house after the happening. Why had he not told anyone sooner? He forgot.

As John took the stand, the defense objected to the admission of his testimony that Leonard complained to him (the objection was later made a continuing one to all complaint testimony). The judge responded by instructing the jury, briefly, that the evidence was not being received as proof of the event, but "to help you determine whether or not his brother [Leonard] told the truth on the stand when he testified." The judge did not elaborate and said nothing about "freshness." John testified to what Leonard said to him, with Morris Cato present. Leonard had not said when it happened. The prosecution tried to elicit from John some relation between the date of the complaint and the times when people moved in or out of the Dion house, but it is fair to say that little came of it.

From Leonard's mother, Ruth Smith, there was testimony that the defendant ceased babysitting when Leonard reached the age of twelve, presumably in 1985. However, the defendant was welcome in the Smith house thereafter. A note of acerbity entered at a time, again unspecified, when a dispute arose between the witness and the defendant over a veterinarian's bill, a quarrel not otherwise described, but apparently still rankling at the time of trial. The prosecution strove again to connect the "complaint" of August 10, 1988, with events at the Dion house. It was stipulated that the defendant moved out of that house finally on July 1, 1988. The witness testified that new people (outside the Dion family)

moved in on August 10, but it may be observed that the defendant himself had departed a month and more earlier. Again the evidence was quite unsatisfactory. The judge charged again, much as before, about admitting Leonard's complaint.[7]

Officer Sullivan testified as a third complaint witness, but added nothing of any substance. The Commonwealth rested.

On the part of the defense, Lucy Wendel, the defendant's mother, gave an account, which was at least pretty consecutive, of the defendant's movements in and out of the Dion house. In January, 1987, she said, the defendant, with his girlfriend and their child, moved out of the Dion house to the house of Vera Branch, his father's fiancee, elsewhere in Lowell;[8] in mid-August, 1987, he moved back with entourage and lived there to July 1, 1988 (the witness herself left in October, 1987). It was on August 15, 1988, Lucy Wendel said, that she rented the house to another family. She conceded, in effect, that the defendant might have visited in the neighborhood of the Dion house when he was residing elsewhere. Vera Branch testified that the defendant and girlfriend and child moved in with her in January, 1987. She placed his moving out at the end of May, 1987. He had been working steadily while he was living at her place.

As the last witness, the defendant testified in agreement with his mother that he had moved to Vera Branch's house in January, 1987, returned to the Dion house in August, 1987, and lived there to July 1, 1988. He said he was working full time to August, 1987, except, perhaps, for turning up late occasionally. The prosecutor was then able to show that he may have skipped whole days when he had to make appearances at District Court on various matters. Over objection, the prosecutor was then permitted to introduce prior District Court convictions of the defendant — two for lar-

---

[7]To conclude on the mother's testimony, she said Leonard had been subject to seizures, but his last EEG was normal. In August, 1988, he was taking Ritalin "on and off."

[8]The Smith house was close by the Dion house and Branch's house was two and one-half miles away, all in Lowell.

ceny over $100 and one for assault and battery with a dangerous weapon.

In his closing argument, the prosecutor made much of those dates of court appearances, contradicting, he suggested, the defendant's testimony about his work record.[9] He chose to assert that on August 10, 1988, when Leonard spoke to John, new occupants had come to the Dion house.

The defendant requested an instruction about the care the jury should use in appraising the credibility of children as witnesses. We take the record to indicate that the judge undertook to charge in the sense of a cut-down version of the defendant's proposed instruction on the subject, but the judge did not do this, and the matter was overlooked. In the final instructions the judge repeated the previous statement about a complaint admitted for a corroborative purpose, then improved upon that instruction by mentioning the "promptness" of the complaint as bearing on the strength of the corroboration.

## Discussion

In considering the appeal, we do well to recur to fundamentals. Justice Holmes wrote in *Commonwealth* v. *Cleary*, 172 Mass. 175, 176 (1898), that the notion of "fresh complaint" is a "perverted survival of the ancient requirement that she [the ravished woman] should make hue and cry as a preliminary to bringing her appeal" of felony. The doctrine is offensive to the modern law of evidence for, as Holmes said, "[i]n general, you cannot corroborate the testimony of a witness by proof that he has said the same thing before, when not under oath." *Ibid.* The doctrine has a measure of prophylactic or negative value: a victim of such an offense might be expected to cry out in complaint to third persons; if the victim did not do so, his or her testimony that a criminal event occurred may become clouded. The doctrine is mischievous unless the complaint is truly "fresh" and the limitations of

---

[9]The prosecutor also questioned the defendant's diligence in trying, but failing, to reach his employer, who supposedly could have testified in his behalf.

complaints as means of corroboration are made clearly understandable to the trier. Because, no doubt, of a realization of how easily the doctrine can be misused or allowed to misfunction, Holmes held that the trial judge should have a distinct control over the reception of complaint testimony — there was to be "a preliminary finding by the judge" (for the record, not communicated to the jury) that the complaint was not "late" as matter of law. *Id.* at 177.

It remains the proper practice for the trial judge to face the question of law squarely and make a distinct ruling, see *Commonwealth* v. *Dockham*, 405 Mass. 618, 626 (1989). We regret that the judge here failed so to act, even though the fault can be unhappily palliated by saying that the submission to the jury implied a ruling on the question of law. See *Commonwealth* v. *Sherry*, 386 Mass. 682, 691 (1982).

Did the judge err in failing to exclude the complaint testimony?

It is recognized that "freshness" is not solely a question of the clock or calendar, yet the passage of time is surely important: as time extends itself, a complaint loses character as a spontaneous accusation after grievous wrong; moreover, opportunity grows for invention or distortion of an event by mistake, twist of memory, fantasizing, contrivance, etc. In the case of child complainants, one allows for some slack of time that may be due to the often-assumed indecisiveness and repressive reactions of children. And one considers whether threats or other kinds of intimidation were applied which might inhibit the first utterance of complaint, and (in much the same sense) what was the relationship between the complainant and the person accused of the crime. One considers, too, in cases where intimidating pressure may have been at work, whether the complainant spoke up when relieved of it.

Upon a fairly thorough search of the reported appeals (but without claim to being complete), we notice the following. In decisions of the 1900's before 1979, we find no instance where more than one day passed between the alleged attack and the complaint that was received in evidence. (Cases in

this period are cited in Appendix A.) From 1979 onward, where more significant delays have been excused, the complainants were generally small children, and either explicit threats were used or the accused was a parent or other familiar, or both elements were present. Still, the time intervals were relatively short, with only one instance running to as much as eighteen months. (Appendix B.) In the latter exceptional case, *Commonwealth* v. *Amirault*, 404 Mass. 221, 228-230 (1989), the defendant, operator of a day school which the four year old victim attended, had threatened to kill her family if she told; the complaint by this bewildered child came only after an investigative interview with her.

In the present case, the Commonwealth counts eighteen months from the putative event to the complaint. The supposed single event (no claim here of repeated abuse, as in many cases) was not fixed with precision at any point in time, and so, as we noted above, the interval involved may be taken as longer by one third (or more), thus a total of two years (or more). At eighteen months, the case is at the far end of decisional experience. No threats or other forms of intimidation were in evidence and an assertion of generalized fear on the complainant's part was promptly negated, and also put in question by the witness's visits to the Dion house after the supposed event. The defendant, although welcome at the Smith house, was surely not a figure of authority at the time of the alleged crime. The prosecutor intimated that the witness's sounding his complaint had some definite relation to happenings at the Dion house but nothing substantial came of it; unfortunately, the prosecutor in summation made a bald assertion about the Dion house occupancy. (Perhaps we should add that without scientific help we cannot know whether in sexual matters the witness should be seen as an adolescent of fifteen or a child of seven.) We conclude that the admission of the complaint testimony was out of line with precedent, unjustified, and reversible error.[10]

---

[10]The error was material. As the prosecutor well realized, the complaint testimony was needed in the attempt to bolster the wavering testimony of the principal witness.

We comment more generally about the quality and fairness of the proceeding.

We have here a principal witness at the margin of competence. The value that can be assigned to his testimony is subject to doubt on that ground. A further discount has to be applied because much of the testimony or responses to questions evidently had been impressed on the mind of this weak witness through rehearsal or insistent repetition: in saying this we do not impute fault to the prosecutor, whose difficulties with such a witness must be obvious.

The defense, on its part, encountered serious difficulties of another kind. As the supposed event was not established firmly in time, satisfactory alibi or similar exculpatory evidence could not be come by; and cross-examination of this witness missed fire not only because of the vagueness of the date of the alleged event, but also because the trier would tend to excuse contradictions or other weakness in such a witness's testimony by reference to his mental or psychological infirmities, rather than to the possible falseness of the testimony itself.

The judge's instructions could be defended as lexically correct as far as they went, but were not as informative as they should have been in a case where all depended on the jury's understanding of what "corroboration" entailed. The two instructions given as the evidence came in did not touch on "freshness" and appeared to assume that the term corroboration was self-proving. The final instruction was better, but without deeper explanation of the rationale of fresh complaint may well have left the jury without a sufficient guide to a hard task. The omission in the circumstances of any instruction about evaluating the credibility of child witnesses (or such witnesses with mental or psychological deficits) was ill advised.

The record does not have a shred of corroboration, in the usual sense, of the testimony that the single alleged criminal event actually happened. The case was thus one of word against word. Here the admission of prior convictions of "dissimilar" offenses was itself a serious, perhaps fatal blow to

the defense. The judge seems to have recognized that he had discretion. He made his decision at the outset of the case. Had he reconsidered it in the light of all the evidence, he might have decided that fairness called for excluding the convictions.

For material error as indicated, the judgment is reversed, the verdict is set aside, and the case is to stand for a new trial if the Commonwealth should be so disposed.

*So ordered.*

### Appendix A.

*Commonwealth* v. *Gangi*, 243 Mass. 341 (1923): one hour. *Commonwealth* v. *Colangelo*, 256 Mass. 165, 166 (1926): immediately afterwards (another complaint made three to four months later was held inadmissible as fresh complaint). *Glover* v. *Callahan*, 299 Mass. 55, 56 (1937): two hours. *Commonwealth* v. *Ellis*, 319 Mass. 627, 629-630 (1946): five hours. *Commonwealth* v. *Howard*, 355 Mass. 526, 530 (1969): two days. *Commonwealth* v. *Hanger*, 357 Mass. 464, 466 (1970): a few hours. *Commonwealth* v. *Izzo*, 359 Mass. 39, 42 (1971): seven hours. *Commonwealth* v. *Tempesta*, 361 Mass. 191, 195 (1972): same evening. *Commonwealth* v. *McGrath*, 364 Mass. 243, 249 (1973): a few hours. *Commonwealth* v. *Bailey*, 370 Mass. 388, 390-391 (1976): next morning. *Commonwealth* v. *Lund*, 5 Mass. App. Ct. 884, 885 (1977): nine hours (court states that another complaint, thirty-one hours later, should have been excluded).

### Appendix B.

*Commonwealth* v. *Edwards*, 7 Mass. App. Ct. 868 (1979): one and one-half days; ten year old victim; defendant lived with mother and victim was afraid of him. *Commonwealth* v. *Healey*, 8 Mass. App. Ct. 938 (1979): three months; eight year old victim; defendant threatened police would take father away if he told. *Commonwealth* v. *Hannaford*, 10 Mass. App. Ct. 903, 904 (1980): six days; adult victim; beaten and hospitalized by defendant after first attempt to complain. *Commonwealth* v. *Wilson*, 12 Mass. App. Ct. 942, 942-943 (1981): four to eight months; ten year old victim; defendant stepfather beat her, warned her not to tell mother. *Commonwealth* v. *King*, 387 Mass. 464, 473-474 (1982): one month (following victim's departure from house); nine year old; beatings; defendant boyfriend of victim's mother, who assisted him in the rapes; threats about complainant's younger sister. *Commonwealth* v. *Brenner*, 18 Mass. App.

Ct. 930, 931-932 (1984): three to four months; eight year old; repeated abuse; defendant friend of mother, visited home often. *Commonwealth* v. *Coull*, 20 Mass. App. Ct. 955, 955-958 (1985): one week; eleven year old; defendant boyfriend of mother; threats with a knife. *Commonwealth* v. *Adams*, 23 Mass. App. Ct. 534, 535-536 (1987): four months; nine year old; defendant acted as stepfather; mother discouraged complaint; repeated abuse. *Commonwealth* v. *Comtois*, 399 Mass. 668, 671-675 (1987): two months (following defendant's departure); eleven to twelve, and thirteen to fourteen year olds; defendant was father and stepfather; warned not to tell; repeated abuse. *Commonwealth* v. *McDonough*, 400 Mass. 639, 651-652 (1987): eleven months; six year old; defendant friend of mother who participated in offenses; repeated abuse. *Commonwealth* v. *Rockwood*, 27 Mass. App. Ct. 1137, 1138 (1989): four to six months; six year old; defendant father; repeated abuse. *Commonwealth* v. *Dockham*, 405 Mass. 618, 625-627 (1989): eleven days; four year old; defendants were victim's parents.

Compare the longest delays excused in the absence of these factors of threat or family ties. *Commonwealth* v. *Gonsalves*, 23 Mass. App. Ct. 184, 185-187 (1986): one month; nineteen year old male; homosexual rape; crying and trembling when finally complained; was discouraged by father's contemptuous reaction from complaining. *Commonwealth* v. *Densten*, 23 Mass. App. Ct. 981, 981-982 (1986): seventeen days; nine year old "special needs" boy. *Commonwealth* v. *Lagacy*, 23 Mass. App. Ct. 622, 624-628 (1987): three weeks; twenty-one year old victim; victim feared defendant after an aggravated rape, and waited until she was able to recall his license plate number before complaining. Compare also *Commonwealth* v. *Montanino*, 409 Mass. 500, 501, 507-511 (1991), *S.C.* 28 Mass. App. Ct. 516 (1990): four years; fifteen year old; two isolated events; defendant scoutmaster; no threats, though generalized fear expressed; defendant had not seen complainant for two years before complaint was made — held, complaint should have been excluded.