COMMONWEALTH vs. MICHAEL W. McKINNON.

No. 92-P-1484.

Plymouth. May 18, 1993. - September 30, 1993.

Present: PERRETTA, DREBEN, & GILLERMAN, JJ.

Rape. Evidence, Fresh complaint, Prior misconduct, State of mind. Practice, Criminal, Assistance of counsel, Argument by prosecutor.

At the trial of a rape indictment, the judge properly ruled admissible testimony of the victim's "fresh complaint," made some two years and ten months after the event, where the judge could reasonably conclude that the delay in disclosure was, in the circumstances, the product of the victim's fear of retaliation from the defendant. [403-404]

At the trial of a rape indictment, the judge properly admitted evidence of the defendant's having abused and threatened the victim's mother in the victim's presence, as it was relevant to the victim's state of mind in explaining her long-delayed "fresh complaint." [404-405]

This court declined to consider, in a criminal case, a claim of ineffective assistance of counsel that had not been raised before the trial judge. [406]

There was no merit to a criminal defendant's challenge to the propriety of the prosecutor's closing argument. [406]

INDICTMENT found and returned in the Superior Court Department on March 19, 1991.

The case was tried before *Cortland A. Mathers*, J.

*Stephen L. Jones* for the defendant.

*Frank M. Gaziano*, Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. Alice (a fictitious name) was the defendant's stepdaughter. At the defendant's trial, Alice testified that when she was seven the defendant raped her, and her mother (Kathy), now deceased, testified in a video deposition taken at the Brockton Hospital, where she was under treatment for cancer, that Alice first mentioned the rape to her two years and ten months after the event. There was no other

evidence of any importance.[1] On the basis of Alice's testimony, and the "fresh complaint" testimony of her mother, the jury found the defendant guilty of rape of a child under sixteen, with force. See G. L. c. 265, § 22A. The defendant appeals, claiming principally that the mother's fresh complaint testimony should not have been admitted in evidence.

1. *Fresh complaint.* The admission of fresh complaint testimony, which lies within the sound discretion of the trial judge, see *Commonwealth v. Montanino,* 409 Mass. 500, 508 (1991), "allows rape victims who . . . *complain promptly* to eliminate any unwarranted skepticism arising from lack of evidence of a prompt complaint." *Commonwealth v. Licata,* 412 Mass. 654, 658 (1992) (emphasis added). When *Commonwealth v. Dion,* 30 Mass. App. Ct. 406 (1991), and *Commonwealth v. Gardner,* 30 Mass. App. Ct. 515 (1991), were decided, we noted that before 1979, no more than one day was allowed to pass between the attack and the complaint, *Dion, supra* at 413, but that after 1979, particularly in the case of children where additional factors are present such as explicit threats, a gap of as much as eighteen months did not disqualify the evidence. *Dion, supra* at 414. *Gardner, supra* at 525. Later that same year we decided, in the case of a complainant aged thirteen, that in the circumstances there presented a delay of two years was "reasonably prompt," in spite of a concern that "[s]o long a period between the event and the complaint as two years provokes unease about the possibility of 'twist of memory, fantasizing, contrivance.' " *Commonwealth v. Hyatt,* 31 Mass. App. Ct. 488, 491-492 (1991), quoting from *Dion, supra* at 413. See *Commonwealth v. Bishop,* 416 Mass. 169, 188 (1993) (citing *Hyatt* with approval).

While there is no bright line test for the timeliness of a complaint, see *Commonwealth v. Bishop, supra* at 187, there are limits beyond which a complaint will be "pronounced stale." *Commonwealth v. Johnson, ante* 211, 216 (1993). See also *Dion, supra* at 413 (" 'freshness' is not solely a question

---

[1]The defendant did not testify; his mother testified briefly that she observed none of the behavior of which complaint is made.

of the clock or calendar, yet the passage of time is surely important . . ."). In *Gardner* we held that thirty-eight months was too long, although we observed in that case that there were no threats to the child, and the complainant ceased to be in the defendant's control one day after the alleged assault. See *Gardner, supra* at 526. Four years was held to be too long a period of delay in *Montanino*, but there the complainant was not related to the defendant, was not threatened by the defendant, and did not live in the same household as the defendant. *Commonwealth* v. *Montanino, supra* at 509. Just recently we held, in *Commonwealth* v. *Johnson, supra* at 215-216, that forty-five months was too long a delay, but again, as in *Gardner*, there were no threats creating fear in the child, and the defendant left the complainant's house shortly after the alleged assault.

These decisions point directly to the need to focus on the circumstances attending Alice's explanation for the delay in reporting the alleged abusive episodes. Here the delay is thirty-four months — enough to provoke "unease," but not enough, standing alone, for the judge to reject the complaint where there is evidence of explanation and justification for the delayed disclosure. But if the judge could not reasonably have concluded that the delay in disclosure was the product of Alice's understandable and credible fear of retaliation, or of some other circumstance that would explain satisfactorily her failure to disclose the alleged rape shortly after it occurred, then we may conclude that the judge abused his discretion in admitting the evidence, and there must be a new trial, for most certainly the error would be prejudicial to the substantial rights of the defendant. We turn, then, to the events surrounding the alleged assault, the delay in reporting, and the disclosure.

Alice was born July 24, 1979. At the trial in May, 1992, she was almost thirteen years old. Alice's mother, Kathy, married the defendant in 1984, Alice being the child of a previous marriage. The family (which included a newborn child of the defendant and Kathy) first lived in Houston, Texas. There Alice saw the defendant's violent and abusive

conduct toward her mother. "It was at night," Alice testified over the defendant's objection, "and I was supposed to be in bed, and I got up and I heard something and I looked in the room, and . . . [the defendant] told . . . [Kathy] to take her clothes off. She said, 'No, why?' He said, 'Just take your clothes off.' So she did, and she said she had to use the rest room, and he said use the rest room on the floor, and so she did. And then, he jumps up, and I ran in my bed, and he got a gun out of his room and Mom ran next door. She was still naked, and he had the gun, and then he wasn't there the next day."

In November, 1986, the defendant, alone, returned to his parents' house in Norwell, Massachusetts. About one month later, acting on the belief that things might work out if she lived with the defendant and his family in Massachusetts, Kathy, together with her children, including Alice, followed the defendant to Massachusetts. Kathy described the circumstances. "I had to sell the cars, sell all my furniture, everything in my home stuff like that. I would have done anything to try to make sure that he was calmed down and not going to hurt me any more. I would have sold the shirt off my back."

Kathy testified that things in Massachusetts were "still terrible, it got worse . . . Oh God, it was kicking, hitting, spitting in my face, saying I was diseased, kicks to the body, punches." She explained, "Well, now he was with everyone he grew up with, he could party more. He could do more drugs, he could leave me and the kids home and know that nothing would really happen because, you know, I was in a strange state, I had no transportation, I did not know anybody at all to contact for any kind of help whatsoever." The judge, in exercising his discretion, was entitled to infer that Alice, who, as described below, lived in the same basement with her parents, was a witness to the defendant's increased brutality.

Alice's testimony about events in Massachusetts contained few embellishments. The McKinnon family all slept in the basement of the house belonging to the defendant's parents.

Often Alice would be in the same bed with her very young half-brother. It was there, on various occasions between December, 1986, and February 14, 1987, while her brother slept, that the defendant approached Alice, sometimes without his clothes on, took Alice's hand, put it on his penis, and then placed his penis inside Alice's mouth. Sometimes this would happen more than once a week. Alice did not tell her mother: "I was scared he was going to do something to Mom or to me." She was scared, she testified, "[b]ecause before, he tried to kill her [Kathy] before." Alice then went on to describe the abusive episode in Texas during which the defendant pursued Kathy with a gun.

By February, Kathy decided to return the two older children to their father in Texas, and Alice left Massachusetts on February 14, 1987. One month after the children left Massachusetts, Kathy was diagnosed with breast cancer, and underwent surgery. She recovered, returned briefly to the defendant, then left and never again lived with the defendant. Meanwhile the children spent their 1987 and 1988 summer vacations with Kathy in Massachusetts; Kathy visited with the children in Texas during the summer of 1989, and the children often came to Massachusetts during their Christmas vacations to visit with Kathy. In addition, Kathy spoke to the children by telephone at least biweekly, and often weekly. Until December 10, 1989, Alice did not mention the alleged rapes on any of these occasions.

On December 10, 1989, Kathy spoke to Alice on the telephone. It was not Kathy's regular call; this time, Alice called Kathy. Kathy testified that she was concerned by the unusual call, and asked if anything was wrong; Alice replied that she had experienced the onset of menses. That subject was discussed and then, according to Kathy, Alice, who was only ten, said, "[I]s it because of what Michael your husband did to me when I was little?" Further on in the conversation, after Kathy told Alice she did not know what Alice was talking about, Alice said, according to Kathy, that the defendant "stuck his penis in her mouth, and touched all over her body, put his fingers inside of her." On direct examination, Alice,

referring to this telephone conversation with her mother, said that the conversation occurred because the defendant was in Arizona.[2]

At the trial in May, 1992, the judge, after reading the transcript of Kathy's video deposition, ruled that "[t]here is abundant motivation on the part of this child to say nothing to anybody." After the videotape was played to the jury, the judge instructed the jury at considerable length about the need for them to determine whether the complaint was fresh, after taking into consideration whether, in the circumstances, the child was deterred by fear from reporting the episode. The judge went on to instruct that if the jury concluded that the complaint was fresh, then Kathy's testimony could only be used to corroborate that of Alice.

We conclude that there was no error in the admission of the fresh complaint testimony. Most striking of all is the evidence of an environment of fear and violence created by the defendant, particularly from the perspective of a young child. In Texas, when no more than seven, Alice witnessed the defendant, gun in hand, pursuing her humiliated, unclothed mother out of their house in her mother's effort to protect her own life. In Massachusetts, she witnessed more violence, and she saw it more frequently: the defendant kicking, hitting, spitting at, and punching her mother. Exposure to this continuing environment of abuse and the defendant's uncontrolled rage can be more effective than any single direct threat. The fact that Alice was not in the defendant's control and was not immediately threatened by violence from the defendant is not critical where, as here, the child could reasonably perceive a serious risk of yet more violence toward her mother. The defendant repeatedly demonstrated his cruelty, and the judge could have concluded that a child would understandably believe that retaliation to either or both of Alice and Kathy would quickly be forthcoming if Alice dared challenge the defendant's conduct. Contrast *Commonwealth*

---

[2]Kathy's memory was that on December 10 the defendant was living in Massachusetts, but that on that date "he was going to Arizona for a job."

*v. Johnson, supra* at 216 (alleged long-standing fear negated by repeated visits home over a four-year period).

The circumstances of Alice's disclosure are equally understandable. Alice, prematurely it seems, was experiencing the onset of menses. Upset and confused, relieved by the knowledge that the defendant was then in Arizona while at the same time mistakenly believing that her mother must have had some knowledge of the abuse that had occurred in Massachusetts,[3] Alice called her mother for reassurance. Alice offered her own explanation of the early onset of menses: the defendant's sexual abuse of her years earlier. What she said was not accusatory; it was her effort to understand what was happening to her. There was no reason to fabricate, embellish, please, or displease. She was not being interrogated by the police or a social worker or a physician. Alice was having an intimate conversation with her mother, that "had a naturalness that . . . [was] not suggestive of contrivance." *Commonwealth v. Hyatt*, 31 Mass. App. Ct. at 492. The judge made no error.

2. *Prior "bad acts."* Alice, on direct examination over defendant's objection, testified to the episode in Texas during which the defendant abused Kathy and threatened her with a gun. The defendant argues that the judge was in error, and that his ruling was highly prejudicial to the defendant's rights. We disagree.

Evidence of the defendant's past misbehavior may be admissible in an appropriate case, but only if relevant for a purpose such as the defendant's pattern of conduct or his motive, or, on the other hand, the victim's state of mind. *Commonwealth v. Chalifoux*, 362 Mass. 811, 816 (1973). *Commonwealth v. Drew*, 397 Mass. 65, 80 (1986). See also Liacos, Massachusetts Evidence 421-422 (5th ed. 1981 & Supp. 1985) (cases collected). Here the evidence was admissible to show Alice's state of mind — the explanation for her long-delayed disclosure of what had happened to her: fear of

---

[3]Alice testified that she thought her mother "knew" of the alleged sexual abuse because "it was going on for a little while and I thought she'd have to know."

the defendant.[4] The judge could justifiably conclude that Alice was put in fear — for herself as well as for her mother — by all that had happened to her mother and to her, and that fear suppressed any impulse to disclose the alleged rapes.

There was prosecutorial necessity for the direct examination of Alice on the Texas episode. On the decided cases, outlined above, a delay, without explanation or justification, of two years and ten months was plainly too long to permit the introduction of the fresh complaint testimony by Kathy. It was essential for the prosecutor — by way of background, as the judge ruled — to introduce evidence of the circumstances which both explained and justified the delay. Compare *Commonwealth* v. *Errington*, 390 Mass. 875 (1984) (admission of evidence of victim's state of mind justified by prosecutor's need to rehabilitate the witness). The judge, in response to the defendant's objection, offered to give a limiting instruction; the defendant requested such an instruction, and the request was granted. As noted above, the judge gave extensive limiting instructions about the fresh complaint doctrine immediately before Kathy's video deposition was shown to the jury. Those instructions stated that acts of violence committed in Alice's presence were relevant only to the issue of whether Alice's complaint was fresh. There was no objection to that portion of the judge's instructions, and there was no error in admitting the evidence.

---

[4]The defendant's reliance on *Commonwealth* v. *Montanino*, 409 Mass. at 505-507, is misplaced. There the evidence objected to was unlawful sexual conduct not involving the same parties and which occurred four years after the event with which the defendant was charged, and thus fell outside the "exception" described in *Commonwealth* v. *Johnson, supra* at 217. While the evidence in *Montanino* was offered under the guise of the victim's "state of mind," plainly it could have been taken by the jury as bearing on the defendant's propensity to commit the crime charged, and thus was inadmissible because it was too prejudicial. *Montanino, supra* at 505-507. Here, the acts had to do with acts of violence and cruelty, other than sexual abuse, which occurred a reasonable time before the events charged, and the evidence was relevant to show — not the defendant's propensity to commit the crime charged — but, as we have said, the victim's state of mind.

3. *Ineffective assistance of counsel.* Appellate counsel, who first appeared in the Superior Court at the defendant's sentencing hearing, made no motion for a new trial, and the claim of ineffective assistance of counsel was never brought to the attention of the trial judge. See Mass.R.Crim.P. 30(c)(2), 378 Mass. 901 (1979). Now, for the first time, we are asked to pass on the performance of trial counsel without the benefit of the judgment of the trial judge, including his findings of fact, that Mass.R.Crim.P. 30(b), 378 Mass. 900 (1979), was designed to secure. We decline to do so. See *Commonwealth* v. *Williams*, 378 Mass. 217, 238 (1979). In any event, the claim consists entirely of speculative assertions totally unsupported by anything in the record and has no merit.

4. *Prosecutor's closing argument.* The defendant's final contention, which challenges the prosecutor's closing argument, also has no merit. The prosecutor's remarks, commenting on the defendant's physical appearance in the courtroom — "seated there in a shirt and tie" — inappropriate though it may be, could not be "fairly understood as permitting the jury to draw an inference adverse to the defendant from the fact of his failure to testify." *Commonwealth* v. *Sherick*, 23 Mass. App. Ct. 338, 344 n.7, *S.C.*, 401 Mass. 302 (1987), quoting from *Commonwealth* v. *Goulet*, 374 Mass. 404, 412 (1974). The defendant's remaining concerns about the prosecutor's closing argument are equally unavailing.

*Judgment affirmed.*