COMMONWEALTH *vs.* RICHARD A. COSTELLO.

No. 92-P-1025.

Bristol. September 14, 1993. - June 22, 1994.

Present: WARNER, C.J., ARMSTRONG, DREBEN, GILLERMAN, & GREENBERG, JJ.[1]

*Evidence*, Fresh complaint, Sexual conduct, Cross-examination. *Child Abuse. Rape. Rape-Shield Statute. Practice, Criminal*, Argument by prosecutor.

At the trial of an indictment in four counts for unlawful sexual intercourse with a child under sixteen, the judge properly admitted as fresh complaint evidence statements made to the complainant's therapist about one year after the last incident alleged. [693-695] GILLERMAN, J., dissenting, with whom GREENBERG, J., joined.

At the trial of an indictment for unlawful sexual intercourse with a child, there was no error in the judge's limiting cross-examination of the complainant, who was fourteen at the time of the alleged incidents and eighteen at the time of trial, regarding the source of her sexual knowledge. [695]

At a criminal trial the judge's clear and prompt instructions to the jury were adequate to remedy any prejudice to the defendant that might have resulted from nonresponsive remarks of a prosecution witness, and the defendant's motion for a mistrial was properly denied. [695-696]

At a criminal trial, remarks of the prosecutor in closing argument, attacking the character of the defendant and stating that for the jury to believe the defendant's version of events all the prosecution witnesses had to have conspired against him, although improper, did not require the defendant be granted a new trial. [696-697]

INDICTMENT found and returned in the Superior Court Department on October 21, 1987.

The case was tried before *James J. Nixon*, J.

*Donald A. Harwood* for the defendant.

---

[1]After circulation of the opinion to the other justices of the Appeals Court, the panel was expanded. See *Sciaba Constr. Corp.* v. *Boston*, 35 Mass. App. Ct. 181, 181 n.2 (1993).

*Mary O'Neil*, Assistant District Attorney, for the Commonwealth.

DREBEN, J. After a four-day trial, a jury found the defendant, Richard A. Costello, guilty of unlawfully having intercourse with a child under sixteen years of age, in violation of G. L. c. 265, § 23. The defendant challenges the conviction on numerous grounds, none of which requires reversal.

The jury could have found the following facts. The parents of the complainant became friendly with the defendant, Costello, in the mid 1970's, when the complainant, Claudia,[2] was about seven years old. Claudia, her parents, and her sisters were then living in Canton. The events referred to in the indictment occurred seven years later when Claudia was fourteen years old.

At the beginning of the relationship between the defendant and Claudia's parents, Costello visited the family on the weekends and one or two times during the week. In 1978 or 1979, Costello began to visit two or three times each week but only during the daytime when Claudia's father was working, and he left before her father returned home. Claudia and her sisters had an "uncle-type relationship" with Costello at the time.

Subsequently, Claudia's family moved to Walpole, and around October, 1984, her parents separated. Claudia went to live in Attleboro with her mother, her younger sister, and her brother, where she continued her close friendship with Costello. Her twin sister and older sister stayed in Walpole with their father.

The Attleboro house, which Costello eventually made his home, had three bedrooms upstairs, one bedroom downstairs, and a finished basement. The defendant did not have a room of his own but slept with Claudia's mother or on the couch downstairs. The incidents that are the subject of the indictments began in October of 1984, a few weeks after Claudia's mother moved to the Attleboro home, and continued through February of 1985. Costello eventually moved out of the Att-

---

[2] The name of the complainant is fictitious.

leboro house sometime in April of 1985. During the summer of 1985 Claudia's mother and Costello resumed their relationship but only for a short time. Ultimately, Claudia's parents reconciled their differences and moved back together.

In May of 1987, Costello instituted a paternity action, seeking custody or visitation rights to Claudia's brother, who was born in November, 1981. Upon hearing that Costello wanted custody, Claudia told her mother of her sexual encounters with the defendant.

*The sexual encounters.* The indictment charges Costello with committing unlawful acts of sexual intercourse with and abuse of a child from on or about October 1, 1984, to about February 28, 1985. At trial, Claudia testified to four incidents during this period: October 9, 1984, November 24, 1984, December 1984, and the middle of or late February, 1985. The following is a summary of Claudia's testimony about these incidents.

The October 9, 1984, incident occurred in her brother's upstairs bedroom. The brother was sleeping in his mother's room, as he often did. Claudia was sleeping in her brother's room. She was awakened by Costello "tickling [her] bum and rubbing his . . . hand up and down [her] back." Claudia was scared, and she protested. Costello persisted, and sexual intercourse followed.

On November 24, 1984, Claudia was again asleep in her brother's bedroom when she was awakened by Costello. This time Claudia insisted that they leave the upstairs for fear they would be discovered. Claudia and Costello went downstairs to the room used as a living room. As she sat on a day bed smoking a cigarette, Costello came behind her with his hands around her chest. She asked him, "Am I crazy or are you crazy?" To which he answered, "No, we are both crazy." Costello removed his clothing, and they engaged in another episode of sexual intercourse.

In December of 1984, Claudia had fallen asleep watching television on the day bed in the living room. She was again awakened by Costello and again they had intercourse.

In mid or late February, 1985, Claudia was in the basement of the house playing pool with Costello. She sat down on the bench of an exercise machine and performed some weightlifting repetitions. Costello went up behind her and started to do pushups. She got up and sat on Costello's bed in the basement; there they had the fourth act of intercourse. According to Claudia's testimony, this was the last occasion on which she and Costello had sexual relations.

*Fresh complaint testimony.* At trial, the Commonwealth called Claudia's therapist, Frederick Auerilo, a psychiatric social worker, to testify as a fresh complaint witness.[3] Over the defendant's objection, he was permitted to testify as to statements made by her.

Claudia's discussion with the therapist took place twelve months after the last incident, and the issue before us is whether the delay was too long. She first saw Auerilo in January, 1986 (at the suggestion of a physician treating her for gastrointestinal symptoms), and, under questioning by him in February, 1986, told him of her relationship with the defendant. Although reluctant to discuss her encounters with the defendant, she indicated to the therapist that there had been sexual relations more than once. She was uncomfortable in listing the exact dates. The therapist gave her "kind of many parameters, and I said, did it happen within the past year?" She answered, "Yes." At a later time she was more specific and stated, "May or June of 1985 [was] a time when they had intercourse." The therapist did not testify to any other aspects or details of the incidents.

Prior to Auerilo's fresh complaint testimony, Claudia, when questioned at trial as to why she didn't tell her parents, had explained:

> Q. "Did you ever have any conversation with the defendant about your telling your mother?"

---

[3]The Commonwealth also called one other fresh complaint witness, Claudia's girlfriend. The defendant only challenges the propriety of admitting the therapist's testimony under the fresh complaint doctrine, not the friend's.

A. "Later on I, you know, I was like, I had told him that my mother was going to find out. And he is like, [Claudia], your mother can't. And he said, your mother will kick you and I both out of the house. And I was like, [w]ell, I guess I can just go live with my father or something. And he says, [Claudia], your father hates me and you don't think for a minute that if he found out that you were doing this with me, that he is going to want you to live there."

. . .

Q. "Did you ever tell your father?"

A. "No."

Q. "Why didn't you?"

A. "Because I was scared, and I thought that — I thought it was my fault. I thought I brought, I thought I was making him do it, or I thought that, you know, in order for him to be a friend of mine, or in order for me to have someone close to me, that if he had to do this, you know, that wasn't a big sacrifice to me then. You know, it was like, well, at least I have somebody, you know, with me."

Claudia also testified that after the defendant moved out of the house, she was "very, very upset" because "he filled a lot of void in my life." Thereafter, she continued to see him until her mother told her if she ever saw him again, she would "kick me out of the house."

In determining whether the delay in reporting the encounters is reasonable, the analysis "should be flexible and attended by due consideration of factors which reasonably might cause a child to repress the urge to cry out to a third person." *Commonwealth* v. *Swain, ante* 433, 439 (1994). While passage of time is important, "freshness" is "not solely' a question of the clock or calendar." *Commonwealth* v. *Dion,* 30 Mass. App. Ct. 406, 413 (1991). Among the factors "one

considers [are] whether threats or other kinds of intimidation were applied which might inhibit the first utterance of complaint, and . . . what was the relationship between the complainant and the person accused of the crime." *Ibid.*

Here, the victim was close to the defendant and was afraid of losing his friendship. She was afraid her parents would find out, be upset, and, perhaps, "kick her out." Moreover, she was confused as to whether she had been at fault. Indeed, in nearly every weekly session with her therapist she discussed "her feelings about what had happened . . . and whether or not she would ever tell her parents, how she may, if she were to, what she would do about it, her feelings towards Mr. Costello, her ambivalence, her guilt."

While complaints as means of corroboration lose reliability with the passage of time, in this case the judge, in his discretion, properly could consider Claudia's fear of her parents' finding out, her guilt, and her ambivalence toward the defendant as sufficient explanation for her earlier failure to divulge the relationship to anyone other than her girlfriend. His conclusion that her statements to the therapist were sufficiently reliable to be admissible as fresh complaint was, in these circumstances, warranted. The therapist's testimony was not inflammatory, contrast *Commonwealth* v. *Flebotte*, 417 Mass. 348, 352-353 (1994), and, while the date given to the therapist as to one incident was not totally consistent with Claudia's direct testimony, the discrepancy was inconsequential. Compare *Commonwealth* v. *Tingley*, 32 Mass. App. Ct. 706, 709-710 (1992). The May-June date does not appear to be an additional incident not charged but rather a failure on the part of Claudia to remember the exact date of one of the rapes.[4]

The fresh complaint evidence was also, in large part, cumulative. In November or December, 1984, Claudia first told

---

[4]Claudia clearly testified that there were four incidents. A policewoman, Elena Clarke, was a witness for the defendant. On cross-examination, without objection, she also testified that the victim told her of four incidents. Thus the statement of the therapist that it happened more than once and the fact that he (or Claudia) erred as to one date added little, if anything, of prejudice.

her girlfriend, see note 3, *supra*, about what was happening, and the girlfriend testified to one, at least, of the incidents. Moreover, Claudia and a policewoman, without objection, testified that she had informed three people of "these incidents," namely, her girlfriend, her boss, and her therapist.[5]

*Limited cross-examination regarding Claudia's sexual knowledge.* The defendant contends that there was error in restricting the defendant's cross-examination regarding Claudia's sexual knowledge. Defense counsel sought to elicit from Claudia and her therapist evidence of her knowledge of sex gained from sexual activity with a man other than Costello, allegedly occurring in January of 1986. General Laws c. 233, § 21B, the so-called rape shield law, ordinarily prohibits such inquiry. The defendant's reliance on *Commonwealth* v. *Ruffen*, 399 Mass. 811, 814-817 (1987), is not warranted. In that case, the defendant was held entitled to a voir dire examination to show that the victim had been abused in the past. Had that earlier experience been similar to the abuse alleged, the court held that that evidence would be admissible to show that the past abuse, rather than any experience with the defendant, explained how the victim (ten years old at the time of trial) acquired sufficient information to describe the sexual acts. *Ruffen* is inapposite. A fourteen year old testifying when she is eighteen (almost nineteen) years old may be assumed to have sufficient knowledge about sexual matters to discuss intercourse.

*Request for a mistrial.* The defendant contends that the judge erroneously denied the defendant's motion for a mis-

---

[5] We also note that the focus of the defense as expressed to the judge in bench conferences was that the episodes were invented and only came to light after the defendant instituted his paternity action in May, 1987, seeking visitation rights to the victim's brother. After the therapist's testimony, the defendant no longer made this claim. Had the fresh complaint testimony of the therapist been excluded, and had the defendant made the claim of recent fabrication, Claudia's statements to the therapist in February, 1986, would have been admissible to rebut the claim that her informing her mother in 1987 was the product of bias against the defendant on account of his paternity suit and a recent contrivance. *Commonwealth* v. *Lacy*, 371 Mass. 363, 370-371 (1976). Liacos, Massachusetts Evidence § 6.15, at 329 (6th ed. 1994).

trial after Claudia's girlfriend, a prosecution witness, made irrelevant and potentially prejudicial outbursts during cross-examination. Among other nonresponsive comments, she stated that Claudia was upset because she thought Costello had impregnated her and that the defendant had shown them pornographic films and had offered them alcohol.

The nonresponsive remarks were potentially prejudicial, but "[t]he decision to deny a mistrial lies within the sound discretion of the judge. Here, the judge relied on curative instructions as an adequate means to correct any error and to remedy any prejudice to the defendant." *Commonwealth* v. *Amirault*, 404 Mass. 221, 232 (1989) (citations omitted). The curative instructions were clear and prompt — the jury were instructed immediately after hearing the outbursts of the witness that the remarks were not responsive, were to be disregarded, and that no attention should be paid to them. The judge also admonished the witness in the presence of the jury. We will presume the jury followed those instructions. *Commonwealth* v. *Helfant*, 398 Mass. 214, 228-229 (1986). See *Commonwealth* v. *Martino*, 412 Mass. 267, 281 & n.10 (1992).

*Closing argument.* The defendant also challenges the prosecutor's closing argument. We emphasize that the concern of the appellate courts in regard to prosecutorial misconduct has been expressed repeatedly. *Commonwealth* v. *Smith*, 387 Mass. 900, 903 (1983). "[E]xtemporized arguments only serve to increase the burdens on the trial judge and to provide grist for the appellate mill." *Commonwealth* v. *Grammo*, 8 Mass. App. Ct. 447, 457 (1979). Improper comments to the jury are only self-defeating. *Commonwealth* v. *Shelley*, 374 Mass. 466, 472 (1978).

The prosecutor said the following in her closing argument: "Well, isn't that just a little too good to be true? . . . Isn't Rick Costello's, I'm a wonderful human being, I'm being railroaded by this vicious family, isn't that just a little too good to be true? Or is he really such a great guy? Maybe he just sent his halo out to the cleaners for this week." These comments improperly attacked the character of the defend-

ant. See *Commonwealth* v. *Burke*, 373 Mass. 569, 575 (1977) (attack on character of defendant improper where that was not an issue at trial).

The prosecutor also remarked that, for the jury to believe the defendant's version of the facts, all the prosecution witnesses had to have conspired against him. These remarks should not have been made. See *Commonwealth* v. *Thomas*, 401 Mass. 109, 115 (1987). Nevertheless, these remarks, even considered with the prosecutor's other improper comments, do not justify reversal.

We have reviewed the remaining arguments of the defendant and conclude that they have no merit and warrant no further discussion.

*Judgment affirmed.*

GILLERMAN, J. (dissenting, with whom Greenberg, J., joins). Hearsay evidence of fresh complaint is admissible to corroborate the complainant's testimony because it "allows rape victims who . . . complain promptly to eliminate any unwarranted skepticism arising from lack of evidence of a prompt complaint." *Commonwealth* v. *Licata*, 412 Mass. 654, 658 (1992). The doctrine is persistently troublesome because it is both "mischievous," *Commonwealth* v. *Dion*, 30 Mass. App. Ct. 406, 412 (1991), and remedial. It is mischievous unless the complaint is "truly 'fresh' "; "as time extends itself, a complaint loses character as a spontaneous accusation after grievous wrong; moreover, opportunity grows for invention or distortion of an event by mistake, twist of memory, fantasizing, contrivance, etc." *Id.* at 412, 413. See also *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 526-527 (1991).[1] The doctrine is remedial because it permits a response to "the societal tendency to disbelieve sexual assault

---

[1] The Supreme Judicial Court has also noted that there is a potential danger that the jury will use the evidence as proof that the offense actually occurred rather than for the limited purpose of corroboration. See *Commonwealth* v. *Lavalley*, 410 Mass. 641, 646 (1991).

victims and to presume that a rape victim will make a prompt complaint." *Commonwealth* v. *Licata*, 412 Mass. at 658. But where the fresh complaint is not obviously fresh, the risk of prevarication may outweigh the benefit of corroborative testimony. The judge has the responsibility to resolve this common, vexing problem by deciding whether to admit the hearsay testimony. See *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. at 524.

Where the complainant is an adult, "freshness" is usually a matter of hours or days, and the problem is not acute. See the appendices to the *Dion* opinion. 30 Mass. App. Ct. at 416-417. The rub comes where, as here, the complainant is a child, and the requirement of hours or days is extended to months or years. See *Commonwealth* v. *Fleury*, 417 Mass. 810, 814-815 (1994) (in cases involving children, "[c]ourts have been flexible in applying the usual fresh complaint strictures . . ."). The rationale is understandable: cases where a child is the complainant "constitute a factually distinct branch of the fresh complaint doctrine . . . [because] special consideration [is given] to the natural fear, ignorance, and susceptibility to intimidations that is unique to a young child's make-up." *Id.* at 814, quoting from *Commonwealth* v. *Amirault*, 404 Mass. 221, 229 (1989).

The cases vary considerably in their details,[2] but in general the requirement of promptness has been relaxed where the child complainant is too frightened to tell of the abusive events because the defendant, often a family member, has threatened the child with dire consequences if the sexual abuse is mentioned.[3] When the threats, the fear, and the intimidation end — commonly when the defendant severs rela-

---

[2]The cases are collected in the appendices to *Commonwealth* v. *Dion*, *supra*, and *Commonwealth* v. *Johnson*, 35 Mass. 211, 219-220 (1993).

[3]In the case of a very young child, ignorance of what is going on may explain the delay in disclosure. Here, however, we have a distinctly mature minor who thoroughly appreciated the significance of what she and the defendant were doing. As the majority note, Claudia, on the second occasion of intercourse, "insisted that they leave the upstairs for fear they would be discovered." Once downstairs, she asked the defendant, "Am I crazy or are you crazy?"

tions with the family — disclosure frequently follows, pre-
sumably because of a child's natural inclination to seek
comfort from the terror of sexual abuse. It is this extended
period of nondisclosure that the judge must analyze before
coming to a decision. Does the proffered reason for the delay,
for example, reveal that the defendant effectively suppressed
any complaint the child would likely have expressed? If not
— that is, if the complainant did not intend to accuse the
defendant until years later under entirely different circum-
stances — then the doctrine of fresh complaint has no place
in the trial of the case. It is only the promptness of a com-
plaint (including any excused delay) that effectively meets
societal "skepticism arising from lack of evidence of a
prompt complaint," *Commonwealth* v. *Licata*, 412 Mass. at
658, for a stale complaint raises the possibility that the accu-
sation may be an afterthought, motivated by a grievance
arising out of a later, unrelated event.[4]

With these considerations in mind, we turn to the facts.
The majority would excuse the delay in disclosure because
Claudia "was afraid her parents would find out, be upset,
and, perhaps, 'kick her out.' " I believe that this misunder-
stands and misinterprets the testimony. In colloquy between
the judge and Auerilo, Claudia's therapist, during the voir
dire of Auerilo, the judge, discussing Claudia's behavior,
said, "[I]f there was, in capital letters, a single precipitating
problem in her life, it was the tumultuous behavior at home,
the fighting between mother and father, the split-up and the
break-up, and some of the kids going one way, and her, the
other kids going the other way . . . [that] motivated her . . .
to have sex with . . . [the defendant]. In fairness, I should
tell you she has already testified to that. She said there was a
void in her life, and he made her feel comfortable, and she
got to want to be with him." Further, there was no evidence
that the defendant behaved violently toward Claudia. As

---

[4]In this case, for example, charges against the defendant were not
brought until after Claudia complained to her mother, but, as the majority
notes, that complaint was precipitated by the paternity action instituted in
1987 by the defendant.

noted, Claudia was aware of the significance of what she and the defendant were doing. "Am I crazy or are you crazy?" she asked the defendant before their second sexual encounter.

It is plain to me, as I believe it was to the judge, that the explanation for the long-delayed disclosure was Claudia's desire to conceal and perpetuate her secret relationship with the defendant. Her only fear was that if her parents "found out" they would bring an end to her relationship with the defendant — a relationship that she felt, as the judge said, filled a "void in her life." In my view, admitting fresh complaint testimony is truly mischievous when the judge, as here, permits a long-delayed disclosure where that delay is chosen by the complainant, not out of fear, but solely to conceal and protect her relationship to the defendant. On this understanding of the facts, which I believe to be correct, the period of nondisclosure starts with the first sexual encounter in October, 1984. The disclosure to Auerilo was in February, 1986. On that basis, I conclude that this case is controlled by *Commonwealth* v. *Dion*, 30 Mass. App. Ct. at 414. The fact that the disclosure to Auerilo was eventually made in the course of therapy, and not as a complaint or accusation at all, only adds to the conclusion that the judge's decision to admit Auerilo's testimony was error.

There is one further difficulty with the majority's decision. Costello, as the majority opinion notes, moved out of the Johnson home sometime in April, 1985. Thus ten months passed by before Claudia revealed the relationship to Auerilo, and it was not until sometime in mid-1987 that Claudia told her mother upon hearing of the defendant's paternity action. If, for any reason I am unable to see, one regards Claudia's initial silence as the product of the defendant's threatening behavior, certainly when the defendant left the house the intimidation ended, leaving no explanation for Claudia's continued silence other than her uncoerced decision to tell nothing of what happened in the past.

The judge's error in admitting hearsay evidence of a "complaint" that was stale by choice and not by fear or intimida-

Commonwealth v. Costello.

tion was highly prejudicial. The jury asked for and received the transcript of Auerilo's testimony. Whatever reasonable doubt that may have existed at that point dissipated under the weight of the testimony of an expert psychiatric social worker. The defendant should be entitled to a new trial. See *Commonwealth* v. *Dion*, 30 Mass. App. Ct. at 414 n.10.